[Civ. No. 8721. Fourth Dist., Div. One. Oct. 31, 1968.]

FRANK MURRAY HOLDER et al., Plaintiffs and Appellants, v. HOME SAVINGS & LOAN ASSOCIATION OF LOS ANGELES et al., Defendants and Respondents.

Stafford W. Prante, Prante & McCabe, Condra, Baxley & Crouch, Classen Gramm and Robert C. Baxley for Plaintiffs and Appellants.

Scales, Patton, Ellsworth & Corbett and Luke R. Corbett for Defendants and Respondents.

WHELAN, J.—Plaintiffs appeal from a judgment notwithstanding the verdict and from an order granting a motion for a new trial in favor of defendant Home Savings & Loan Association of Los Angeles (Home) under section 629, Code of Civil Procedure.

The action in the court below was brought by uniting the separate causes of action of 29 sets of plaintiffs; the action was dismissed as to three sets; and one set was divided by the death of the husband, Viau, prior to trial. We treat of each set of husbands and wives as one plaintiff.

The jury returned 26 separate verdicts for varying amounts, including one in favor of Mrs. Viau. The total of the verdicts, including in each an award of punitive damages, was $201,000; all were against Home. The jury also found as to plaintiffs Bustamente that a contract entered into by them had been rescinded by them.

### THEORY OF RECOVERY

Each plaintiff originally alleged a cause of action for rescission of an agreement to purchase real estate because of the alleged fraud of Home, with damages; and a cause of action for damages only because of such alleged fraud. They alleged that they had purchased from Home.

The fraud alleged was misrepresentation and concealment as to the amount necessary and sufficient to cover a monthly prorate of taxes levied upon the parcels of real property

respectively the subjects of purchases made by the various plaintiffs. It was alleged that the misrepresentations were made by Home through its agents. Allegations that values had been misrepresented were abandoned prior to pretrial.

In a third cause of action each plaintiff charged a conspiracy among Home and several persons who acted as sales agents in the sales to the plaintiffs, and that the alleged misrepresentations and concealments were made in pursuance of the conspiracy.

All plaintiffs, except Bustamente, elected to abandon the cause of action for rescission.

A motion for nonsuit was granted as to each of the causes of action charging conspiracy.

The amount of the awards of compensatory damages, except that in favor of Bustamente, was based in theory on the difference between the contract prices and the market values of the various lots as improved.

### THE EVIDENCE

Rexford Terrace was a residential subdivision in Poway, San Diego County, the map of which was filed with the Recorder of San Diego County on July 15, 1959.

The owner and subdivider of the property was Rexford Terraces, a limited partnership (Rexford), of which Rexford Construction Company (Construction Company), a corporation, was general partner. The capital of the partnership, $130,000, was invested in the purchase and improvement of the property; an additional $85,000 furnished by the partners was spent in maintenance and sales promotion.

Home, after the subdivision map was filed, lent $975,000 to Rexford for construction of residences on 75 of the lots; and on July 16, 1959, agreed with Rexford to make loans to purchasers that might qualify for Veterans Administration (V.A.) or Federal Housing Authority (F.H.A.) loans.

Rexford then started construction of the first houses, which were to be used as models in the sales campaign that commenced some 30 to 60 days after the start of such construction.

On October 2, 1959, Home made a second loan to Rexford of $711,500 for the construction of 56 additional residences on that number of lots.

Rexford selected Mesa Realty Company as its sales agent, which in turn was represented by Thomas Hayes (Hayes) and Delmar Pease (Pease) in its dealings with the plaintiffs.

The sales were made by obtaining written offers to purchase on printed forms. The first among the plaintiffs signed an offer on October 26; all but four had signed before October 1, 1960; another signed on December 4, 1960; one in March and another in April 1961; Bustamente, the last to sign, did so on January 20, 1962.

Rexford, in preparation for the sales campaign, had obtained certain information from Home based upon estimates made by Home's escrow department.

Having been informed of the sales prices of the different models of houses, an employee of Home's escrow department made a calculation as to the amount that would have to be paid monthly on principal and interest to amortize the unpaid balance of sales price over a period of 29 years. Where loans were under the Veterans Administration program, nothing had to be paid down on account of the purchase prices.

Home also estimated the amount to be paid into escrow to cover the prorated pre-paid taxes for the current year and insurance premiums; which, with amounts to cover title charges, loan fees, recording costs, credit investigation, and other such specific items, were to be deposited in escrow by the buyers. It made an estimate of what amount monthly should be paid and held to meet recurring taxes and insurance premiums during the life of the loan.[1]

The only information available as to taxes actually assessed had to do with the unimproved property from which the subdivision was carved.

The method used in estimating what the taxes might be for the tax year 1960-1961 prior to the time when factual information was available for the purpose of relating the monthly payments thereto was to take the amounts for annual taxes that had been found to be a satisfactory estimate for separate lots sold for comparable prices in several comparable subdivisions in San Diego County.

William Posey (Posey), one of Home's escrow officers, in making his original estimates as to the amount of tax

---

[1]Regulations of the Federal Housing Authority adopted pursuant to authority given by the Congress of the United States require that the mortgage given by a borrower to a lender making a loan approved by F.H.A. make equal monthly payments sufficient to amortize the estimated amounts of all taxes and fire and other hazard insurance premiums to be held by the lender for making such payment; and that the security instrument make provision for adjustments in case the estimated amount of taxes shall prove to be more or less than the amounts paid by the borrower. (F.H.A. 3000-51 N.H.A. Sec. 203 mutual mortgage.)

There is a similar regulation of the Veterans Administration.

impounds, did not check with the assessor's office as to the tax rate.

He was familiar with a 1961 Veterans Administration bulletin which stated that tax estimates made by lenders: ". . . must be based on information obtained on diligent inquiry at a dependable source, such as the tax assessor's office. Approximate annual real estate taxes must reflect a full year's normal taxes (without exemption) based on current tax rates for the completed improvements."

Posey had intended his estimates to be as nearly exact as was warranted by the facts upon which they were based; he knew that the amount of monthly payments and the sales price were important factors entering into the making of an offer to purchase.

The information as to the estimates so made was furnished by Home to Rexford, which passed it on to Mesa Realty through which conduit it reached Hayes and Pease.

All the offers to purchase provided for the payment of the sales price plus the various items of expense mentioned, payment of prorated taxes for the current fiscal year, and the monthly payment of an estimated amount to be impounded by Home to meet the payment of future taxes and insurance premiums (impounds). It specified that those amounts were estimated. It also set out an amount as the total estimated monthly payment including taxes and insurance premiums.

Each of the offers to purchase contained the following: "It is understood and agreed that there has been no representation or inducement made to Buyer except as herein set forth to purchase said property, and that no person has any authority to make representations or inducements other than as herein set forth. That no salesman, employee or agent of the Seller, or independent broker has any authority to modify the terms hereof or to make any agreements, representations or promises not contained herein. No agreement or representation has been made by the Seller, its agents or representatives to obtain any loan for the Buyer or to guarantee that the Buyer will qualify for or secure any loan."

Each of the prospective purchasers agreed to make application for a V.A. guaranteed loan or F.H.A. insured loan. The monthly payments to be made to the lender, including taxes and insurance premiums, were stated in the contract to be approximate and to be in accordance with the appropriate governmental agency rules and regulations.

In the sales made to plaintiffs, Home acted as escrow holder. Its escrow department was in Los Angeles County. Whenever some six offers to purchase had been obtained by Rexford, Posey came down to the tract sales office and had the buyers sign the escrow instructions.

At other times Home sent the proposed escrow instructions by mail to Rexford, and after having been signed by the purchasers they were mailed back.

Each set of instructions specified that the transaction was contingent upon the buyer's obtaining a loan, and contained these provisions:

"Buyer understands that the Fiscal Tax Year is from July 1st to June 30th; that properties are assessed as of the first Monday in March for the next Fiscal Tax Year; that Tax Bills are not available until approximately November 1st of each Tax Year.

"Buyer further understands that at the time of closing this Escrow there will be approximately $100.00 available in his impound account to be used for payment of Real Estate Taxes.[2]

"Buyer further understands that the following facts cannot be pre-determined: 1. Closing date of this escrow. 2. Credit Balance in Impound Account available for payment of Real Estate Taxes as Tax Bills come due. 3. Amount of Tax Bill prior to its receipt by Lender.

"You are therefore authorized to bill Buyer and Buyer agrees to pay on demand any deficiencies necessary for payment of Real Estate Taxes and Hazard Insurance."

On the date of signing of escrow instructions, each of the plaintiffs signed a written application for a loan directed to Home.

After approval of the loans by one or other of the federal agencies, notes and trust deeds were executed and the escrows closed. The length of the period between the signing of an offer to purchase and the closing of escrow varied from as little as two to as much as eight months.

The assessed value of the unsubdivided unimproved land for fiscal 1959-1960 was approximately $17,670; the total assessed value of 77 subdivided lots, exclusive of improvements, other than grading, curbs, paving, etc., was approximately $64,270 for fiscal 1960-1961.

Before the tax bills for 1960-1961 arrived, Home discovered

---

[2]The figure of $100 mentioned in this paragraph was not found in all escrow instructions; the amount varied.

that the assessed values placed on the lots were higher than the estimates based on the valuations of comparable properties for the earlier year; there was also a higher tax rate applicable, partly resulting from the difference in school or special district levies. The effect of such higher taxes was that the accumulated monthly impound payments made since July 1, 1960, were not sufficient on a prorated basis, thus creating a potential deficit for the first installment payment of taxes, and a necessity to increase the future monthly payment into the tax impound accounts.

On October 4, 1960, Home wrote to Rexford as follows: ''In view of the present tax situation on Unit 1 of Rexford Terraces, covering Lots 1 to 59 inclusive, Lots 90 to 93 inclusive and Lots 115 to 126 inclusive of said tract, it will be necessary to increase the initial impounds from $400.00 to $550.00 on all new sales.''

On October 7, 1960, Security Title Insurance Company sent to Rexford a lot-by-lot list of 1960-1961 taxes and assessed values on the lots; the covering letter stated that the computations had been made by the title company, that the assessments had been made on unfinished houses, and that the next year's taxes (on the finished houses) would be even higher.

The information as to the tax burdens for 1960-1961 thus communicated to Rexford was reflected in the estimates of monthly tax payments inserted in three of the offers to purchase made after November 1, 1960 (Bustamente; Clausen; Hess). The other offer to purchase made after November 1, 1960, was by Fisher; since his escrow did not close until May 3, 1961, there was no deficiency in his account for pro-rated taxes for the remaining two months of 1960-1961.

Before most of the lots in Rexford Terraces had been sold, there was a slump in the residential real estate market in San Diego County. As a result, sales of the Rexford Terrace lots fell off and Home foreclosed its blanket trust deed on 56 lots; proceedings for the foreclosure were commenced in January 1962 and completed in August.

A real estate salesman and appraiser testified as to the market values of the various lots purchased by plaintiffs and gave his opinion as to each of them that its market value was substantially less than the sales price. There was also testimony that supported values as great as the sales prices.

In dealing with some of the plaintiffs, Hayes or Pease assured them that the estimates as to the monthly prorate of taxes were accurate and had been prepared by Home, said by the salesmen to have had vast experience in such matters.

At the time of signing offers to purchase, certain of the plaintiffs had given checks payable to Home. Those plaintiffs, as a result, had the impression they were dealing with Home in their purchases.

Others obtained the impression they were dealing with Home in their purchases because the salesmen mentioned Home as being one of the biggest savings and loan associations, and said the tax information had been furnished by Home.

To some of the plaintiffs the amount of the monthly tax impounds was of importance because they worked within tight monthly budgets, and they relied upon the information as to the amounts of such payments in making their offers to purchase.

Certain of the plaintiffs who dealt directly with Posey when signing escrow instructions asked him about the accuracy of the estimates of the monthly tax payments and were told they were accurate to within a dollar or two. Posey did not tell any of them to go to the county assessor's office for information.

Posey assured Bionda that if his payments were quoted at $120 a month that was what they would be.

Holder told Posey that he was on a limited budget and could afford only so much for a house payment; Posey replied that Home: ". . . was the world's largest home loan association and they knew their business, or words to that effect, and that I wouldn't have any problems in that area."

At the time of closing of his escrow, Bell inquired of Home's escrow officer if the monthly payment of $120 would be sufficient to cover everything and was told it would be.

Melrod complained because for 30 to 40 years he would be expected to pay $20 per month more than he had bargained for when he purchased the house.

In March 1962, a meeting was called by some of the plaintiffs, to which Carnell and Lee, officers of Home, were invited and which they attended.

Some of the plaintiffs first saw mention of Rexford Terrace in newspaper advertisements. None of them saw Home mentioned in any advertisement, nor in any of the promotional literature or brochures. at the tract office, nor on any of the business cards of the salesmen.

Bustamente, who signed an offer to purchase on January 20, 1962, was eager to move into the house; accordingly he signed a written rental agreement with Rexford under which he took possession at a weekly rental of $22.50. About February 15, 1962, he learned that Home had refused to seek

approval of a loan from the federal agency because his offer to purchase made no provision for a deposit to cover the incidental costs for title charges, prorates of taxes for 1961-1962, etc; and Rexford, by a subterfuge, would have had such charges paid out of a purported down-payment of $1,100 on the purchase price, of which in fact only $100 had been paid and of which the remaining $1,000 was to be paid only at the close of escrow. Home's representative came to Poway and gave that information to Bustamente and also told him the estimated amount of monthly payments for taxes would have to be increased.

Bustamente made his first rental payment covering at least four weeks by check to Rexford; two other checks he made payable to Home, at whose direction does not appear. He delivered them all to Winninger, Rexford's agent; they appear to have been credited by Home to some account of Rexford.

Bustamente spent about $1,000 on such things as drapes and carpeting; he moved out on June 1, 1962, after telling Winninger of his intention to do so, leaving the drapes and carpeting. No one told him that he might not remove them. The $100 he had paid on the offer to purchase was not refunded.

The verdict in Bustamente's favor was for $1,100 compensatory and $900 punitive damages.

Two of the plaintiffs, Clausen and Sharpe, suffered foreclosure under the trust deeds given by them.

Clausen dealt with Pease and another agent named Scranton. He moved into the property around May 1961, after signing an offer to purchase on March 11 and escrow instructions on March 31. His escrow closed on July 28, 1961. A month after moving in he went himself to the county assessor's office for information as to taxes. He received notice to move after the foreclosure in April or May 1963.

Sharpe signed his offer to purchase on September 3, 1960, and escrow instructions on September 28; the escrow closed on December 9, 1960.

Before foreclosure, both Clausen and Sharpe were given opportunity by Home to quitclaim their interests without incurring liability to reimburse the United States of America for the amount paid by it to Home for loss suffered by Home in the foreclosures.

The foreclosures against Sharpe and Clausen were commenced after each of those plaintiffs had over a period of

several months attempted to make monthly payments of the amounts fixed by Home as the then estimated amounts necessary to take care of the increased tax burden. The payments so tendered were rejected because both Sharpe and Clausen refused to pay the amount found to be deficient in the impound accounts for taxes current at the close of escrow; in Sharpe's case, for 1960-1961; in Clausen's case, for 1961-1962.

The verdict in favor of Clausen was for $2,046 compensatory and $7,800 punitive damages.

Sharpe's verdict was for $2,119 compensatory and $10,000 punitive damages.

With the exceptions of Sharpe, Clausen and Bustamente, the verdict for exemplary damages was for $5,000 as to each plaintiff.

### The Parties to the Action

There were 24 sets of plaintiffs in the original complaint filed August 21, 1962. The named defendants were Home and two of its officers, Darnell and Lee. The conspiracy count named Mesa Realty, Hayes and Pease as coconspirators; they were not joined as defendants. Rexford was not made a defendant.

A fourth amendment to the complaint was filed January 2, 1964, joining for the first time as plaintiffs Leonard, Lyons, Predovich, Steine and Thompson.

The Leonard escrow closed July 5, 1960; the Lyons escrow, June 16, 1960; the Predovich escrow, November 1, 1960; the Steine escrow, June 14, 1960; the Thompson escrow, September 6, 1960.

### The Issues

The appeal raises the following issues:

Were the real estate salesmen the agents of Home in making any false representations that were made by the salesmen?

Was the tax information given by Home to the Rexford salesmen knowingly false; and was such information given by Home in the form of a statement of an existing or predictable fact?

Did Home give to Rexford tax information that was false without using reasonable diligence to determine the truth concerning the subject of the information?

May reliance be placed upon representations with regard to taxes to be levied in future?

Was the Bustamente action for rescission maintainable without joining Rexford, the vendor, as defendant?

Was there any evidence to sustain a finding that Home was party to a conspiracy to defraud, which would have made Hayes and Pease the agents of their coconspirator?

Were the causes of action of Leonard, Lyons, Predovich, Steine and Thompson barred by the pleaded statute of limitations?

What would have been the proper rule of damages on the causes of action of Clausen and Sharpe?

### *Were the real estate salesmen the agents of Home?*

There is no evidence to support the jury's specific finding that the salesmen were "effectively" the agents of Home. The theory that there was an ostensible agency rests only upon the fact that the information as to the estimated proration of taxes yet to be levied was furnished to Rexford by Home. Home did not do anything to induce a reasonable man to believe that the salesmen were its agents in making sales. That is not to say that if the other elements necessary to support a judgment based upon fraudulent misrepresentation were present, a judgment against Home would be unsupported.

It is beyond question that Home furnished the estimates for monthly tax impounds for use by Rexford and the sales agent selected by Rexford, knowing that such estimates would in turn be furnished to prospective buyers.

Home states that the last-mentioned basis of potential liability is presented for the first time on appeal. It is clear that counsel for the plaintiffs presented it in the trial court as early as the argument on the motion for judgment notwithstanding verdict.

### *Did Home furnish tax information that was known by it to be false?*

Prior to the first Monday in March 1960 (March 7), the only information that could have been available to Home as to the actual levy of taxes on the subdivided property was as to the taxes on the property for 1959-1960 and earlier years on the property in its unsubdivided condition. (Rev. & Tax. Code, § 2807.)

Thereafter the assessed value of the separate lots perhaps could not be known until after the first Monday in July (Rev. & Tax. Code, § 405), while the tax rate to be applied possibly could not be known until after September 1 (Gov. Code, § 29120), and the actual tax levied on a parcel perhaps could

not be known before October 1 (Rev. & Tax. Code, § 2601).[3] Only after October 1 could tax bills have been sent out.

No showing was made whether information as to the assessments on the subdivision lots was actually available earlier than the first Monday in July 1960; nor whether the tax rate had been fixed for 1960-1961 prior to September 1, 1960; nor whether the tax rolls had been delivered to the auditor prior to October 1, 1960.

Six of the plaintiffs signed the contract to purchase prior to March 1, 1960; three during March; three in April; three in May; three in June; two in August; two in September; one in December 1960; one in March and one in April 1961; and one in January 1962.

There is. therefore, no evidence that Home gave false information as to existing tax liabilities as to any lot for which the contract to purchase was signed prior to the filing of the 1960-1961 assessment rolls by the auditor, which might have been no earlier than October 1, 1960 and could not have been earlier than September 1, 1960.

There is no evidence that as to lots the contracts to purchase which were signed prior to the first Monday in July 1960 (July 4), Home either knew or had reason to know what its assessed valuation would be.

The evidence produced by plaintiffs shows that in the first week in October 1960 Home advised Rexford that the initial deposit to take care of the incidental costs and the opening of the impound account for taxes and insurance must be increased from $400 to $550 because of the tax situation of which Home had learned.

Either Rexford failed to pass on that information to its sales agents. Mesa Realty, or Mesa's salesmen ignored it. In fact, the salesmen thereafter accepted offers to purchase in which the original deposit was to be applied not to the costs of the escrow but on account of the purchase price.

There is no evidence that Home had actual knowledge of that fact prior to the time it refused to send to the federal agency Bustamente's application for a loan because Bustamente's offer to purchase did not call for an initial payment to cover the incidental costs.

On the question whether Home, in giving the estimated amount necessary to be impounded for taxes, represented to Rexford that the amounts were exact amounts necessary to

---

[3] A 1966 amendment changed this date from October 1 to the fourth Monday in September. (Stats 1966, 1st Ex. Sess., ch. 147, § 92, p. 678.)

meet existing taxes in a known amount, or future taxes in an amount that was predictable, we have only the testimony of Posey concerning the manner in which he made the estimates, and the testimony of Johnson, manager of Rexford, that he understood the figures to be estimates.

We have only the testimony of the plaintiffs as to the representations of the salesmen. The testimony that the salesmen presented the figures as being factually reliable may be accepted; but there is no evidence to indicate that Home knew that actual misrepresentation would be made as to the nature of the information conveyed by it.

It is true that Home intended the estimates to be as nearly accurate as the data upon which they were based would permit. Indeed, if Home did not attempt to make the estimates accurate within that frame of reference, it would be blameable on that account. Thus, because Home furnished only an estimate, but intended an accurate estimate based upon information as to taxes assessed against other, though comparable, lots, it exposes itself to possible attack either because it attempted or did not attempt accuracy, an attack based upon a misconception of what it was possible for Home to do and what it intended at the time it made the estimates.

It is of no consequence that at that time Posey did not seek information from the assessor's office, because at that time none of the lots was or could have been separately assessed. (Rev. & Tax. Code, § 2807.)

The plaintiffs who testified to conversations with Posey at the time of signing escrow instructions had already entered into their contracts to purchase; those escrow instructions were signed prior to any date on which it could be said as a matter of law that information as to the assessed values for fiscal 1960-1961 must have been available.

Statements made by one of Home's escrow officers when the Bell escrow closed cannot be said to have been a representation either influencing or being intended to influence the execution of a contract made four months before. Since the escrow closed June 15, 1960, it cannot be said that the escrow officer's statement indicated a callous or reckless disregard of, or indifference to, the known or knowable facts or the rights of the purchasers.

*Did Home give to Rexford tax information that was false without using reasonable diligence to ascertain the truth?*

We have discussed that question in treating of the subject whether the information was known or should have been

known to be false. For the reasons discussed under that heading, it cannot be said that Home failed to use due diligence in making use of available information at the time it made its estimates in 1959.

Whether it had a duty to seek out information at the earliest possible date as to the assessed valuations and tax rates for 1960-1961 and make new estimates based thereon is another question.

No testimony was presented as to when such information first became available. When such information was actually received by Home, it transmitted it to Rexford, which had received detailed and reliable information from the title insurance company at about the same time. Home should not be held responsible for the careless or deliberate failure of Rexford and its agents to give such reliable information to the prospective purchasers.

*May reliance be placed upon representations with regard to taxes to be levied in future?*

■ In general, reliance may be made by a buyer of real estate upon representations as to existing tax liens, amounts of taxes for current or prior years, or assessed values for current or former years. (*Yorke* v. *Taylor,* 332 Mass. 368 [124 N.E.2d 912]; *Suraci* v. *Ball,* 160 Pa. Super. 349 [51 A.2d 404]; *Clark* v. *Thorpe Bros.* 117 Minn. 202 [135 N.W. 387]; *Chanler* v. *Venetian Properties Corp.,* 254 Mich. 468 [236 N.W. 838]; *Stanton* v. *St. Michell,* 130 Wash. 449 [227 P. 737]; *Klika* v. *Albert Wenzlick Real Estate Co.* (Mo.App.) 150 S.W.2d 18.)

Certain of the cited cases generally support the proposition that such reliance may be justifiable even though the purchaser fails to consult the public records from which the fact might be ascertained. There is authority to the contrary where there is no relation of trust and confidence (*Kalmans* v. *Powles,* 121 Wash. 203 [209 P. 5, 29 A.L.R. 618]).

Whether in a particular case the purchaser relied or had a right to rely is a matter of fact depending upon the particular circumstances, including the language in which the representation is couched. (*Resnick* v. *Varouxakis,* 319 Ill.App. 51 [48 N.E.2d 555]; *Coates* v. *Bacon,* (Ont. 1874) 21 Grant (Ch.) 21; *Gaertner* v. *Rees,* 259 Minn. 299 [107 N.W.2d 365].)

■ The rule is different as to statements with regard to future assessments or levies of taxes. The fixing of assessed values of property and of tax rates is solely within the power

of public officials, whose decisions are not and should not be subject to control by a property owner, so that representations made by a private person as to such matters may not justifiably be relied on. (*Morel* v. *Massalski*, 333 Ill. 41 [164 N.E. 205]; *3700 S. Kedzie Bldg. Corp.* v. *Chicago Steel Foundry Co.*, 20 Ill.App.2d 483 [156 N.E.2d 618].)[4]

Under the facts of the present case, we are of opinion that the estimates made by Home as to the amounts necessary to be paid monthly to take care of future taxes could not reasonably be relied upon as statements of what the future taxes would be.

*Was the joinder of the vendor necessary to a cause of action for rescission?*

■ Bustamente's alleged purchase was made before Home foreclosed on the unsold lots.

It is argued on his behalf that Home was the real party in interest, and for that reason the rule of *Wedge* v. *Security-First Nat. Bank,* 219 Cal. 113 [25 P.2d 411], should apply. That case had to do with rescission by a purchaser from the holder of the legal title who appeared as vendor in the contract of sale without any indication it held title in trust for another.

There is no evidence from which it could be said that Home was the true owner when the Bustamente contract was signed; and it did not then hold title and was not a party to the contract of sale.

In an action for rescission of a contract, all parties to the contract are indispensable to the action. (*Hartman Ranch Co.* v. *Associated Oil Co.,* 10 Cal.2d 232 [73 P.2d 1163]; *Miracle Adhesives Corp.* v. *Peninsula Title etc. Assn.,* 157 Cal.App.2d 591 [321 P.2d 482]; *Holt* v. *College of Osteopathic Physicians & Surgeons,* 61 Cal.2d 750, 761 [40 Cal.Rptr. 244, 394 P.2d 932]; Code Civ. Proc. § 389.) The absence of an indispensable party is a jurisdictional defect. (*Hartman Ranch Co.* v. *Associated Oil Co., supra; Irwin* v. *City of Manhattan Beach,* 227 Cal.App.2d 634 [38 Cal.Rptr. 875].)

*Was there evidence that defendant Home was party to a conspiracy?*

[4]Even here, there may be room for exceptions. In those jurisdictions where property put to certain uses may be constitutionally exempted for a limited number of years as an incentive to industrial development, it is possible that a false representation that such an exemption had been granted might be actionable.

As always, a broadly stated negative rule might still leave room for relief to a victim of misplaced trust in one occupying a fiduciary position.

 The conspiracy count was dismissed properly as the result of the granting of a motion for nonsuit directed to it.

It is a legal commonplace that the existence of a conspiracy may be inferred from circumstances, and that the conspiracy need not be the result of an express agreement but may rest upon tacit assent and acquiescence. (*Chicago Title Ins. Co.* v. *Great Western Financial Corp.*, 69 Cal.2d 305, 316 [70 Cal.Rptr. 849, 444 P.2d 481].)

 The essentials to the existence of a conspiracy are defined as follows: concert of action between the conspirators to accomplish the purpose of the conspiracy, the taking of illegal actions in furtherance of a common scheme or design to achieve the unlawful purpose of the conspiracy, and knowledge on the part of the alleged conspirators of the conspiracy and its unlawful purpose. (*Clark* v. *Lesher*, 106 Cal.App.2d 403, 409 [235 P.2d 71].)

 The last cited case is put forward by plaintiffs in support of their claim that there was sufficient evidence of a conspiracy in which Home was a party. *Clark* v. *Lesher*, *supra*, dealt with the sufficiency of pleadings, not with evidentiary questions.

The record here does not show that any officer of Home knew of an intent to misrepresent wilfully the amount of existing tax liens or liabilities, or of an intent to give assurance as a matter of fact of the amounts of future tax levies.

*What would have been the proper measure of damages awarded to vendee, whose contract rights have been foreclosed?*

 Foreclosure proceedings against Clausen and Sharpe were completed before trial of the action.

The award of punitive damages in favor of each was substantially in excess of the award of such damages in favor of any other of the plaintiffs. If an explanation were sought, it might be in the fact that as the result of foreclosure each was possibly subject to liability to the United States for the amount the latter was obliged to pay under its insurance or guarantee of the loans.

The awards of compensatory damages in favor of Sharpe and Clausen seem to have been based upon the testimony as to the difference between the contract price and the actual value.

While a defaulting vendee is not, because of the default alone, to be denied a right to recover damages because of fraud in the inducement of the contract, the measure of dam-

ages in such case is not the difference between the contract price and the value of the property, but is the difference in value between everything with which he parted and everything he received, or his actual out-of-pocket loss. (*Garrett* v. *Perry,* 53 Cal.2d 178, 184 [346 P.2d 758].)

## Incidental Question

A serious question arises as to the proper measure of compensatory damages were any award to be made to the plaintiffs other than Clausen, Sharpe and Bustamente.

Section 3343, Civil Code, declares the following rule: ''One defrauded in the purchase, sale or exchange of property is entitled to recover the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received. together with any additional damage arising from the particular transaction.''

The rule so declared superseded the former loss of the bargain rule in such transactions, a rule that was based upon a determination of the extent to which the falsity of a representation affected the value of property.

The question is whether section 3343 does away entirely with the necessity that the falsity of the representation should affect the value of the property to some extent.

It is clear that false representations as to the amount of an actual tax lien on property that places the lien as less than it is will generally affect the value of the property only in the amount of the difference between the actual and the represented amount of the lien. Indeed, it is in general true that the higher the taxes levied on property in relation to other properties within the same taxing jurisdiction, the higher its value in proportion to such other properties.

The Restatement of the Law of Torts (1938) declares this rule: ''The measure of damages which the recipient of a fraudulent misrepresentation is entitled to recover from its maker as damages under the rule stated in § 525 is the pecuniary loss which results from the falsity of the matter misrepresented. including (a) the difference between the value of the thing bought, sold or exchanged and its purchase price or the value of the thing exchanged for it. . . .''

We interpret that to require a causal relationship between the misrepresentations and the difference in value. (See also Prosser on Torts, page 748.)

If section 3343, Civil Code, be similarly interpreted, the proper measure of damages in a case such as this would be the

difference the vendee is required to pay in taxes because of the misrepresentation. Since the amount of future taxes would be purely speculative, damages for any but the ascertained difference in taxes would have to be excluded.

The opinion in *Gagne* v. *Bertram,* 43 Cal.2d 481, 491 [275 P.2d 15], contains language supportive of that view: "It may be assumed that lots with 3 to 6 feet of fill would not be as valuable as ones identical in other respects with only 12 to 16 inches of fill. Accordingly, by proving that the fill was deeper than defendant had reported, plaintiffs established that they were induced to buy lots that were less valuable than they had anticipated."

The decision in *Haines* v. *Fisher,* 147 Cal.App.2d 415 [305 P.2d 124], was based on a finding of such causal relationship.

Because unnecessary to a decision in this case, we suggest the question only as one to be answered in appropriate circumstances.[5]

*Were the causes of action of Leonard, Lyons, Predovich, Steine and Thompson barred by the statute of limitations?*

▇ Home's answer alleged that those causes of action were barred by the provisions of section 338, subdivision 4, Code of Civil Procedure.

The amendment to complaint setting up those causes of action was filed more than three years after the date of the most recent of their contracts of purchase. It did not allege when the claimed fraud was discovered by any of those five plaintiffs, nor why it was not discovered earlier.

Where the action is not commenced within three years from the commission of the fraud, it is imperative that the plaintiff plead in his complaint facts showing the time and manner of discovery of the fraud, and the facts which excuse the plaintiff's failure to discover the fraud sooner. (*Orange County Rock etc. Co.* v. *Cook Bros. Equipment Co.,* 246 Cal.App.2d 698 [55 Cal.Rptr. 265]; *Weir* v. *Snow,* 210 Cal.App.2d 283 [26 Cal.Rptr. 868]; *Lady Washington Consol. Co.* v. *Wood,* 113 Cal. 482 [45 P. 809].)

The issue may be raised by answer. (*Beatty* v. *Oakland Sheet Metal etc. Co.,* 111 Cal.App.2d 53 [244 P.2d 25]; *Smith* v. *Tristam,* 130 Cal.App. 750 [20 P.2d 770].)

The issue here was raised by answer; it was set out again in the pretrial order.

No attempt was made to amend the complaint to set forth the necessary allegations either before or after trial. Nor is

---

[5]Rescission, of course, might be had without proof of damage.

the evidence, so far as those five plaintiffs is concerned, clear as to when they first discovered the facts as to the alleged fraud. They have neither pleaded nor proved facts to avoid the effect of the bar of limitations.

### The Motion for New Trial

Plaintiffs in their opening briefs attacked the order granting a new trial as being against the preponderance of the evidence. In a closing brief they claim for the first time that the order is deficient in form under section 657, Code of Civil Procedure, as amended in 1965; they quote portions but not all of the order.

The order is specific in stating the matters as to which the evidence was insufficient, and in the reasons for which the awards of punitive damages were unwarranted. In granting a new trial after a verdict in favor of a plaintiff, the trial court can hardly detail nonexistence of every variety of evidence that might support an ultimate finding of fact. In granting a new trial after a defense verdict, it is wholly possible to point out the evidence in the record that would have justified plaintiffs' verdict, as in *Mercer* v. *Perez,* 68 Cal.2d 104 [65 Cal. Rptr. 315, 436 P.2d 315].

We are of the opinion that the order met the requirements of section 657 as amended and that the order provisionally granting the motion for new trial was properly made.

The judgment is affirmed.

Brown (Gerald), P. J., and Coughlin, J., concurred.

A petition for a rehearing was denied November 20, 1968, and appellants' petition for a hearing by the Supreme Court was denied December 24, 1968.