[S.F. No. 23748. Aug. 10, 1979.]

JOSEPH R. WYATT et al., Plaintiffs and Respondents, v.
UNION MORTGAGE COMPANY et al., Defendants and Appellants.

COUNSEL

Ball, Hunt, Hart, Brown & Baerwitz, Joseph A. Ball, Joseph D. Mullender, David G. Finkle, Laurence F. Jay, Michael J. Maloney, Patrick T. Madden, Michael C. Cohen and Renie E. Yoshida for Defendants and Appellants.

Steven J. Schwartz, Volk, Newman, Marsh, Gralla & Karp, James H. Karp, Bruce H. Newman, Richard L. Goff, Heller, Ehrman, White & McAuliffe, Pettit & Martin, Joseph W. Rogers, Jr., and Susan M. Popik as Amici Curiae on behalf of Defendants and Appellants.

Irvine P. Dungan for Plaintiffs and Respondents.

Stanley W. Blackfield, Peter F. Elkind and Boxer & Elkind as Amici Curiae on behalf of Plaintiffs and Respondents.

OPINION

BIRD, C. J.—This is an appeal brought by a mortgage loan broker, its affiliated corporations, their principal shareholder, and several of the

corporations' officers and directors from a judgment which imposed on them compensatory and punitive damages for breach of duties which were allegedly owed to respondents during the negotiation of a second mortgage loan. Liability of all but one of the appellants is premised on a theory of civil conspiracy. Appellants contend that (1) the record discloses neither the breach of a duty nor the existence of a conspiracy, (2) the trial court erred in concluding that the statute of limitations on respondents' claims was tolled until the "last overt act" in the conspiracy, and (3) punitive damages were excessive.

## I

Stockton Home Mortgage Company (Stockton) and Union Home Loans (formerly Union Mortgage Company) (Union) are affiliated corporations engaged in the mortgage loan brokerage business. Stockton operates primarily in northern California, while Union's business is confined to the southern part of the state. Appellant Western Computer Service (Western) is the servicing agent for loans negotiated by Stockton and Union, and appellant Secured Investment Corporation (Secured) is its predecessor. Appellant Irving Tushner (Tushner) is the principal and controlling shareholder of Stockton, Union, Western and Secured. All of the corporations use the business name "Union Home Loans" and are headquartered at the same Los Angeles address. Appellants Esther Flink (Flink) and Elinore Tushner are Tushner's sister and former wife, respectively; each served one or more of the appellant corporations as an officer or director during some or all of the time described in the complaint. Appellant David Marks (Marks) served as president · of Secured and Western during a portion of the period at issue.

The essential facts elicited at trial, viewed most favorably to respondents, appear as follows: In 1966, Stockton carried on an extensive television advertising campaign in the Sacramento area. One frequently aired advertisement announced that a $1,000 loan could be paid back completely, principal and interest, for $18 per month. In fact, no such loan was available.

Lured by the advertising claims, respondents, Joseph and Clarice Wyatt, visited Stockton's Sacramento office in November 1966. They sought to retain Stockton's services to negotiate a second mortgage loan on their home for purposes of completing certain home improvements. (Such loans are solicited by mortgage brokers from private, noninstitutional lenders.) Respondents agreed in writing to a loan negotiated by

Stockton in the gross amount of $1,325 (including the brokerage fee and closing charges), with payments of $20 per month over 36 months (the 1966 loan). The loan officer orally advised respondents that a "small" balloon payment would be due in the 37th month. (A balloon payment is the amount necessary to amortize principal and interest unpaid at maturity when the prescribed monthly installments have been insufficient to do so.) Because Mr. Wyatt worked seasonally as a construction laborer, respondents specifically inquired of the loan officer about the "grace period" for late installments and were told that a late charge would not be assessed until a payment was 10 days overdue. In response to respondents' further questions about the interest rate, the loan officer quoted a figure of "seven or eight percent."

At a second session, the loan officer produced a "stack" of loan documents, including a retainer agreement, a promissory note, escrow instructions, and a second trust deed. The officer leafed through the documents, briefly describing each and showing respondents where to sign. However, he never pointed out significant provisions of the written agreements or suggested that respondents read them carefully. The loan instruments actually imposed an annual interest rate of 10 percent, allowed only a five-day "grace period" for delinquent payments, and assessed a *late charge* of 1 percent of the original loan balance for each overdue installment (i.e., $13.25 for each $20 installment). The actual estimated balloon payment, assuming all installments were timely paid, was set forth in the broker's loan statement as $950.70. However, the written loan agreement further provided that monthly installments would be applied first to accrued late charges and interest, rather than to reduction of principal; unreduced principal would thus be deferred until the end of the loan term, accruing additional interest in the interim. All these amounts would be added to the final balloon payment.

Respondents were late with several of their payments on the 1966 loan. Consequently, they faced a balloon payment in March 1970 of $1,340, more than the original loan principal. When respondents asked why the final payment was so high, the late charge and interest provisions of the loan agreement were explained to them. Stockton refused to extend the term of the 1966 loan, and respondents were unable to find other financing. Therefore, in March 1970, they agreed to refinance the unpaid balance through Stockton. A loan (the 1970 loan) was then negotiated in the aggregate principal amount of $2,000, with payments of $45 per month for 36 months; the loan document disclosed an estimated balance due in the 37th month of $816.18. Provisions for interest and late charges

were similar to the 1966 loan. Late charges were again assessed during the term of the 1970 loan, and the actual amount demanded by Stockton at maturity (April 1973) was $1,193.16.

After repeated threats of foreclosure on their home, respondents brought suit in July 1973. Their complaint alleged, in substance, that Stockton's misleading television commercials, its misrepresentations about the terms of the 1966 loan, its failure to call respondents' attention to the very unfavorable provisions buried in the loan papers, and its extraction of late charges on the 1970 loan despite the timely payment of all installments, breached the fiduciary duty which is owed by a mortgage loan broker to those who engage its brokerage services. The complaint further alleged that the foregoing resulted from a fraudulent conspiracy engaged in by all of the appellants. Respondents sought compensatory and punitive damages, and imposition of a constructive trust.

The parties stipulated to the issuance of a preliminary injunction staying the foreclosure on respondents' residence pending a final determination of the action, and for so long as monthly installments were paid toward the balance claimed due. In June 1975, two weeks before trial, respondents, finding other financing, repaid the 1970 loan.

To prove the existence of a conspiracy among the appellants, respondents produced, at trial, a former employee who had prepared some of the advertising for the affiliated corporations after 1966. Confirming the use of the misleading television commercials in Sacramento during 1966, this employee testified that appellant Tushner had frequently stated, in meetings attended by all of the other individual appellants except Flink, that it was company policy to pursue late charges vigorously as a prime source of income, and that, if one payment was delinquent, all subsequent payments were also to be considered late. "Late charge" income figures for Secured and Western were introduced at trial for the years 1966 through 1974; the annual amounts increased from approximately $152,000 in 1966 to over $1 million for the two corporations combined in 1971.

The individual appellants were beyond subpoena range and declined to testify at trial. However, respondents read into the record selected portions of appellants' depositions, which described the corporate positions occupied by each and their respective duties. The jury assessed separate awards against each appellant, totalling $25,000 in compensatory damages and $200,000 in punitive damages. The trial court denied

appellants' motion for new trial after respondents consented to a reduction of the compensatory award to $1,000.

## II

This court must first decide whether the jury verdict is supported by evidence that the appellants did in fact breach fiduciary obligations owed to the respondents. Appellants take the position that their duty of disclosure was fully met when they presented to respondents written loan documents containing all the information required by Business and Professions Code section 10241.[1] Appellants also claim they never charged respondents' account with late charges unless payments were actually overdue.

A mortgage loan broker is customarily retained by a borrower to act as the *borrower's agent* in negotiating an acceptable loan. All persons engaged in this business in California are required to obtain real estate licenses. (Bus. & Prof. Code, §§ 10130 and 10131, subd. (d).) Thus, general principles of agency (Civ. Code, §§ 2228 and 2322, subd. 3) combine with statutory duties created by the Real Estate Law (see Bus. & Prof. Code, § 10176, subds. (a), (i)) to impose upon mortgage loan brokers an obligation to make a full and accurate disclosure of the terms of a loan to borrowers and to act always in the utmost good faith toward their principals. "The law imposes on a real estate agent 'the same obligation of undivided service and loyalty that it imposes on a trustee in favor of his beneficiary.' [Citations.] This relationship not only imposes upon him the duty of acting in the highest good faith toward his principal but precludes the agent from obtaining any advantage over the principal in any transaction had by virtue of his agency. [Citation.]" (*Batson* v. *Strehlow* (1968) 68 Cal.2d 662, 674-675 [68 Cal.Rptr. 589, 441 P.2d 101].) A real estate licensee is "charged with the duty of fullest disclosure of all material facts concerning the transaction that might affect the principal's decision. [Citations.]" (*Rattray* v. *Scudder* (1946) 28 Cal.2d 214, 223 [169 P.2d 371, 164 A.L.R. 1356]; see also *Realty Projects, Inc.* v. *Smith* (1973) 32 Cal.App.3d 204, 210 [108 Cal.Rptr. 71]; *Smith* v. *Zak* (1971) 20 Cal.App.3d 785, 792-793 [98 Cal.Rptr. 242].)

In the present case, respondents testified they did not read the stack of written loan documents before signing them in 1966. However, respondents did ask the broker about the rate of interest, late payments, and the size of the balloon payment due at the end of the loan period. In

---

[1] The 1973 amendments to the law on real property loans (Bus. & Prof. Code, § 10241.1 et seq.) are not applicable to the present case.

response to their questions, respondents received the materially misleading and incomplete information already described in this opinion. (*Ante,* pp. 779, 780.) Given this evidence, the jury justifiably concluded that Stockton did not satisfy its fiduciary obligations of disclosure and good faith toward its principal in regard to the 1966 loan.

■ In the context of insurance policies, this court has long recognized that oral misrepresentations made by an agent to a policyholder are actionable, despite the fact that the written policy itself accurately discloses all terms. "[I]f the agent of the insurer *undertakes to advise* [a policyholder], . . . it should be the duty of such representative to make no false or misleading statement in that respect." (*Glickman* v. *New York Life Ins. Co.* (1940) 16 Cal.2d 626, 634 [107 P.2d 252, 131 A.L.R. 1292].) Other cases have similarly held that the existence of a confidential relationship may justify reliance upon oral misrepresentation of the terms of a contract. (See *Security-First Nat. Bank* v. *Earp* (1942) 19 Cal.2d 774, 777 [122 P.2d 900]; *Kloehn* v. *Prendiville* (1957) 154 Cal.App.2d 156, 161-162 [316 P.2d 17].)

■ There is a second reason why appellants breached their fiduciary obligations toward respondents. In the context of insurance policies, this court has recognized that a fiduciary's duty may extend beyond bare written disclosure of the terms of a transaction to duties of oral disclosure and counseling. The leading case is *Raulet* v. *Northwestern etc. Ins. Co.* (1910) 157 Cal. 213 [107 P. 292], where this court refused to enforce a clause in a fire insurance policy on furniture which voided the policy if the property was or became encumbered with a chattel mortgage. The court wrote as follows: " 'It is a matter almost of common knowledge that a very small percentage of policy-holders are actually cognizant of the provisions of their policies. . . . The policies are prepared by the experts of the companies, they are highly technical in their phraseology, they are complicated and voluminous. . . . The insured usually confides implicitly in the agent securing the insurance, *and it is only just and equitable that the company should be required to call specifically to the attention of the policy-holder such provisions as the one before us.*' " (*Id.,* at p. 230, italics added; see also *Motor T. Co.* v. *Great American Indem. Co.* (1936) 6 Cal.2d 439, 444 [58 P.2d 374]; *Glickman* v. *New York Life Ins. Co., supra,* 16 Cal.2d at pp. 631-632.)

The reasoning of these cases applies to transactions with mortgage loan brokers as well. Here, the record discloses that respondents were persons of modest means and limited experience in financial affairs, whose equity

in their home was their principal asset. They retained a mortgage loan broker to negotiate for them highly complex loan terms and they may be assumed to have justifiably relied on the latter's expertise. Against such a backdrop, the broker's failure to disclose orally the true rate of interest, the penalty for late payments or the swollen size of the balloon payment clearly constituted breach of the broker's fiduciary obligations. It is noteworthy also that the provisions regarding interest rate, late charges and balloon payment were highly unfavorable to the borrower and yet the broker made no attempt to draw his clients' attention to these matters.

■ The evidence of actual fraud involved in the 1970 loan is a third reason for finding the appellants guilty of breaching their fiduciary duties. Respondents testified that, mindful of the late charges incurred on the first loan, they made timely payment of all installments until February 1972. Thereafter, payments were made by respondents' disability insurer and the timeliness of those payments is not contested. Nevertheless, appellants charged the Wyatt account on the 1970 loan with several late charges. At trial, they introduced no evidence whatsoever to support their contention that these late charges were proper. The jury once more could reasonably have inferred that the late fees were erroneously imposed and that the error was part of a scheme to defraud respondents.

### III

Appellants next contend that there is no substantial evidence of a conspiracy. Appellants stress that no one except Stockton participated in the making of loans to the Wyatts; they further claim that none of them had knowledge of what the employees of Stockton discussed with the Wyatts during the loan transactions.

Appellants mischaracterize what is necessary to support a finding of a civil conspiracy. ■ As long as two or more persons agree to perform a wrongful act, the law places civil liability for the resulting damage on *all* of them, regardless of whether they actually commit the tort themselves. (*Unruh* v. *Truck Insurance Exchange* (1972) 7 Cal.3d 616, 631 [102 Cal.Rptr. 815, 498 P.2d 1063].) "The effect of charging . . . conspiratorial conduct is to implicate all . . . who agree to the plan to commit the wrong as well as those who actually carry it out. [Citations.]" (*Black* v. *Sullivan* (1975) 48 Cal.App.3d 557, 566 [122 Cal.Rptr. 119].)

Therefore a plaintiff is entitled to damages from those defendants who concurred in the tortious scheme with knowledge of its unlawful purpose.

(*Black* v. *Sullivan, supra,* 48 Cal.App.3d at p. 566.) Furthermore, the requisite concurrence and knowledge " ' "may be inferred from the nature of the acts done, the relation of the parties, the interests of the alleged conspirators, and other circumstances." ' " (*Chicago Title Ins. Co.* v. *Great Western Financial Corp.* (1968) 69 Cal.2d 305, 316 [70 Cal.Rptr. 849, 444 P.2d 481].) Tacit consent as well as express approval will suffice to hold a person liable as a coconspirator. (*Holder* v. *Home Sav. & Loan Assn.* (1968) 267 Cal.App.2d 91, 108 [72 Cal.Rptr. 704].)

■    Directors and officers of a corporation are not rendered personally liable for its torts merely because of their official positions, but may become liable if they directly ordered, authorized or participated in the tortious conduct. (*United States Liab. Ins. Co.* v. *Haidinger-Hayes, Inc.* (1970) 1 Cal.3d 586, 595 [83 Cal.Rptr. 418, 463 P.2d 770].) Personal liability, if otherwise justified, may rest upon a "conspiracy" among the officers and directors to injure third parties through the corporation. (*Golden* v. *Anderson* (1967) 256 Cal.App.2d 714, 719-720 [64 Cal.Rptr. 404]; cf. *Gruenberg* v. *Aetna Ins. Co.* (1973) 9 Cal.3d 566, 576 [108 Cal.Rptr. 480, 510 P.2d 1032]; *Wise* v. *Southern Pacific Co.* (1963) 223 Cal.App.2d 50, 72 [35 Cal.Rptr. 652].)    ■    Shareholders of a corporation are not normally liable for its torts, but personal liability may attach to them through application of the "alter ego" doctrine (see, e.g., *Associated Vendors Inc.* v. *Oakland Meat Co.* (1962) 210 Cal.App.2d 825, 836-837 [26 Cal.Rptr. 806]), or when the shareholder specifically directed or authorized the wrongful acts.

■    When judged against these legal standards, the record supports the jury verdict. First, evidence was introduced at trial to show it was company policy to lure potential borrowers such as respondents into their offices through misleading "bait and switch" advertising. Secondly, on several occasions, appellant Tushner instructed other company officials that "late charges were a great source of income," and that "it had been a policy of the company that if the first payment was late, all the rest of the payments would automatically be late."

The record further discloses a tightly knit, family-oriented business operation under appellant Tushner's close personal control. Tushner owned all or a controlling interest in each of the affiliated corporations. Each of the other individual appellants was an officer or director of one or more of the corporations and each was active in some management position at some time during the years when the conspiracy is alleged to have occurred.

Finally, all the headquarters offices of appellant corporations were in the same building. The first loan papers signed by respondents at Stockton's Sacramento office included a deed of trust containing printed instructions that, when recorded, the deed should be mailed to "Union Home Mortgage Company." Soon after the loan papers were negotiated, a letter was sent to respondents on the letterhead of "Union Home Loans." The letter instructed respondents to mail all payments to Secured Investment Corporation in Los Angeles. The procedure on the second loan was similar, except that payments were mailed to Western Computer Services.

From the above evidence, the jury could reasonably conclude that the breaches of fiduciary duties owed to respondents were undertaken pursuant to established company policies agreed to by each of the appellants.

### IV

Appellants contend that the statute of limitations barred respondents' claims. They reason that the three-year period allowed for commencing actions based on fraud (Code Civ. Proc., § 338, subd. 4) had passed, the complaint having been filed six years after the first loan and more than three years after the second loan.[2]

However, the trial judge correctly noted that, when a civil conspiracy is properly alleged and proved, the statute of limitations does not begin to run on any part of a plaintiff's claims until the "last overt act" pursuant to the conspiracy has been completed. (*Schessler* v. *Keck* (1954) 125 Cal.App.2d 827, 832-833 [271 P.2d 588].) Here the "last overt act" was appellants' collection a few weeks before trial of the final payment on the 1970 loan. This was the culminating act in the conspiracy to defraud respondents which began with the first tortious act in 1966. Therefore, the trial judge correctly refused to instruct the jury on the statute of limitations.

Appellants would have this court repudiate the "last overt act" doctrine of *Schessler* v. *Keck, supra,* 125 Cal.App.2d 827. *Schessler* derived the doctrine by analogy to the law regarding *criminal* conspiracies. However, appellants stress, it is only because a criminal conspiracy is itself a

---

[2]The gravamen of respondents' cause of action is that the appellants committed actual and constructive fraud by conspiring to breach their fiduciary duties toward the respondents. Therefore, Code of Civil Procedure section 338, subdivision 4 states the applicable statute of limitations.

punishable and continuing wrong that courts stay the running of the statute of limitations until acts in furtherance of the conspiracy have ceased. This rationale, appellants conclude, is absent in the case of a civil conspiracy, precisely because such a conspiracy is neither a punishable offense standing alone nor a wrong capable of supporting a cause of action by its own weight.

The differences between civil and criminal conspiracies are accurately characterized by appellants. However, they are somewhat beside the point. ▰ Statutes of limitations have, as their general purpose, to provide repose and to protect persons against the burden of having to defend against stale claims.[3] (*Telegraphers* v. *Ry. Express Agency* (1944) 321 U.S. 342, 348-349 [88 L.Ed. 788, 792-793, 64 S.Ct. 582]; *Shain* v. *Sresovich* (1894) 104 Cal. 402, 406 [38 P. 51].) So long as a person continues to commit wrongful acts in furtherance of a conspiracy to harm another, he can neither claim unfair prejudice at the filing of a claim against him nor disturbance of any justifiable repose built upon the passage of time.

In the present case, for instance, appellants stood accused of continuing their tortious conduct in furtherance of the conspiracy up until—and even after—the filing of the complaint. It was their own conduct that kept the cause of action against them alive. Therefore, no considerations of justice or equity require us to overrule the consistent line of cases that have applied the "last overt act" doctrine to civil conspiracies. (*Bedolla* v. *Logan & Frazer* (1975) 52 Cal.App.3d 118, 136-137 [125 Cal.Rptr. 59]; *Kenworthy* v. *Brown* (1967) 248 Cal.App.2d 298, 301 [56 Cal.Rptr. 461]; *Schessler* v. *Keck, supra,* 125 Cal.App.2d at pp. 832-833.)[4]

---

[3]Thus, the concurring and dissenting opinion misreads this court's opinion when it states that the majority view the statute of limitations as "intended primarily to confer 'respose' on deserving defendants." (Conc. and dis. opn., *post,* at p. 797.) We give equal consideration above to protecting persons "against the burden of having to defend against stale claims." In the present case, as the concurring and dissenting opinion itself points out, a witness to the actual conspiracy was still available and testified at trial.

[4]Contrary to the claim of the concurring and dissenting opinion (*post,* at p., 795), acceptance of the "last overt act" doctrine does not mean accepting the view that the civil conspiracy is itself a tort. Instead, it is precisely because the civil conspiracy is not a tort or a cause of action itself that the tolling of the statute of limitations on the underlying torts in this case becomes relevant at all.

Justice Richardson's reliance (*post,* at pp. 792, 793) on *Bowman* v. *Wohlke* (1913) 166 Cal. 121 [135 P. 37] is also misplaced. The court there simply held that, under then existing statutory provisions, "causes of action for injuries to property may not be united in one action with causes of action for injuries to the person or character." (*Id.,* at p. 124.) The court also held that statutory rules governing pleading required causes of action united in one complaint to be stated separately. (*Id.,* at p. 127.) The plaintiff had tried to avoid the effect of these rules by arguing that his allegations of civil conspiracy in effect created a

The situation of the respondents, on the other hand, demonstrates the equities served by the "last overt act" doctrine in cases where the fraud is of a continuing nature. There was substantial evidence that appellants were involved in perfecting a scheme whose purpose was to trap respondents on a financial "treadmill" from which they could not escape. Once trapped by the unexpectedly large balloon payment due at the end of the first loan, the respondents found themselves forced to refinance the loan, much as appellants planned. (Efforts to obtain financing from other sources failed.) This permitted the repetitive collection of brokerage fees and late charges from respondents, depleting their resources and moving foreclosure ever closer.

When, as here, the underlying fraud is a continuing wrong, a convincing rationale exists for delaying the running of the statute of limitations. Just as the statute of limitations does not run against an action based on fraud so long as the fraud remains concealed, so ought the statute to be tolled *even after the fraud is discovered, for so long as the sheer economic duress or undue influence embedded in the fraud continues to hold the victim in place.*[5]

None of the cases relied on by appellants has disapproved the holding in *Schessler.* In *Agnew* v. *Parks* (1959) 172 Cal.App.2d 756 [343 P.2d 118], plaintiff alleged a conspiracy to obstruct the orderly prosecution of her malpractice action. However, the face of the complaint made apparent that the last fraudulent act pursuant to the conspiracy occurred more than three years prior to the filing of the pleading. Under these circumstances, the court held that defendants' motion for nonsuit was properly granted. Such a holding, of course, is entirely consistent with *Schessler.* That case still requires a plaintiff to allege that at least some act pursuant to the conspiracy was still being performed (or was only discovered) within the applicable statute of limitations time period.

---

single cause of action, uniting all the wrongs done in furtherance of the conspiracy. (*Id.,* at p. 124.) This was the argument the court rejected in *Bowman* v. *Wohlke.* Nothing in today's opinion changes that result. In fact, issues concerning joinder or separate statement of causes of action are not germane to this case. Moreover, unlike the plaintiff in *Bowman* v. *Wohlke*, plaintiff here has never argued that civil conspiracy itself is a cause of action.

[5]This court need not decide today the question of whether this principle would apply, even if the continuing fraud were pursued by one person acting alone. (For a discussion of the effect that proof of undue influence or duress has on the running of the statute of limitations in other kinds of cases, see *Developments in the Law—Statutes of Limitations* (1950) 63 Harv.L.Rev. 1177, 1219.)

That *Schessler* and *Agnew* v. *Parks* are entirely consistent was made clear in *Bedolla* v. *Logan & Frazer, supra,* 52 Cal.App.3d at pages 136-137, where the court wrote: "[W]hile the cases support the proposition that a cause of action based on civil conspiracy accrues on the date of the commission of the last overt act in pursuance of the conspiracy (*Schessler* v. *Keck* (1954) 125 Cal.App.2d 827, 832-833 . . .), it is imperative for the plaintiff to allege when the last overt act took place (*Agnew* v. *Parks, supra*)." Since over four years had lapsed between the "last overt act" of the conspiracy and the filing of the complaint, the *Bedolla* court held that the statute of limitations had run on the cause of action. (See also *Kenworthy* v. *Brown, supra,* 248 Cal.App.2d at pp. 301-303; *Filice* v. *Boccardo* (1962) 210 Cal.App.2d 843, 846 [26 Cal.Rptr. 789]; *Teitelbaum* v. *Borders* (1962) 206 Cal.App.2d 634, 637-638 [23 Cal.Rptr. 868].)

Finally, it is noteworthy that many of the arguments now urged against the "last overt act" doctrine were presented to the Court of Appeal in *Rodriguez* v. *North American Aviation, Inc.* (1967) 252 Cal.App.2d 889 [61 Cal.Rptr. 579]. In that case plaintiff charged defendants with conspiring to defame him by publishing defamatory remarks on or about October 9, 1962, then again on October 31, 1963. Plaintiff alleged that he was dismissed from his employment on October 31, 1963, due to these defamations. He filed suit on October 13, 1964. The applicable statute of limitations was one year.

The trial court sustained a demurrer to the entire complaint but the Court of Appeal reversed, relying on the fact that the complaint had been filed within one year of the "last overt act" pursuant to the alleged conspiracy. (*Id.,* at pp. 893-894.) Thus, even while expressing some doubt about the wisdom of the *Schessler* case in dicta, the *Rodriguez* court went on to use the "last overt act" doctrine to judge the sufficiency of the pleading before it.

The *Rodriguez* court specifically declined to rule on whether the statute of limitations barred recovering damages flowing from the earlier publication, finding it impossible to tell from the complaint whether the plaintiff meant to claim separate damages for each of the two publications. Because the Court of Appeal thus avoided this issue, the *Rodriguez* case gives little support to appellant's argument that the statute of limitations has run at least on the first of the two loans obtained by the respondents. This court is satisfied that *Schessler* v. *Keck, supra,* 125 Cal.App.2d 827 correctly states the law of this state.

V

Appellants' final contentions concern the jury's decision to award punitive damages.[6] Appellants first argue that the evidence was not sufficient to justify awarding punitive damages. Even if there was justification for punitive damages, appellants urge this court to find that the amount awarded was excessive as a matter of law.

■ Appellants' first argument is totally without merit. There was substantial evidence to support the jury's determination that the appellants were guilty of fraud when they conspired to breach their fiduciary duty toward the respondents. Therefore, this was an entirely appropriate case in which to award punitive damages. Fraudulent misrepresentations by real estate brokers have supported punitive damages in the past. (See, e.g., *Ward* v. *Taggart* (1959) 51 Cal.2d 736, 743 [336 P.2d 534].)

■ Nor can this court agree that the amount of punitive damages was excessive as a matter of law. As a recent case makes clear, the purpose of punitive damages is to penalize wrongdoers in a way that will deter them and others from repeating the wrongful conduct in the future. (*Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 928, fn. 13 [148 Cal.Rptr. 389, 582 P.2d 980].) "How much" in punitive damages is enough to accomplish this purpose in a particular case is not susceptible of mathematical definition. (*Finney* v. *Lockhart* (1950) 35 Cal.2d 161, 164 [217 P.2d 19].)

In the present case, the concealment from borrowers of the company policy regarding "late charges" comprised the core of appellants' wrongful conduct. At trial respondents introduced direct evidence showing that the "late charge" policy was the income-generating motor for Secured and Western, bringing in millions of dollars during the years respondents' loans were being serviced by one of the two companies.[7] The structure of the corporations was such that the jury could reasonably infer that the individual appellants (shareholders, officers or directors of

---

[6]Civil Code section 3294 provides in pertinent part: "[W]here the defendant has been guilty of oppression, fraud, or malice, express or implied, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant."

[7]The parties stipulated the "late charge" income of Secured to be as follows: $151,841.15 (1966); $492,629.99 (1967); $664,409.36 (1968); $558,552.85 (1969); $668,673.78 (1970); $647,797.63 (1971). The parties stipulated the "late charge" income of Western to be as follows: $451,833.69 (1971); $565,173.87 (1972); $459,984.02 (1973); $517,570.28 (1974).

Secured or Western or one of its affiliates) had personally profited from the wrongful conduct. Therefore, an award of $200,000, apportioned among eight corporate and individual appellants, was not excessive. Indeed, the trial judge, in denying appellants' motion for new trial, thought the award showed remarkable restraint. This court agrees. The uncontested evidence shows that the award was much less than the income directly generated by appellants' wrongful conduct.

The judgment is affirmed.

Tobriner, J., Mosk, J., Manuel, J., and Newman, J., concurred.

**RICHARDSON, J.**—I concur in the reasoning of parts II and III of the majority opinion; I also agree that punitive damages, if properly awarded on all counts of the complaint, were not excessive. I respectfully dissent, however, from the judgment of affirmance, because I believe the statute of limitations barred much of respondents' complaint. In my view, the "last overt act" doctrine should not be applied in civil cases.

As the majority concedes, the maxim that the statute of limitations on a "conspiracy" is tolled until commission of the "last overt act" originated in criminal law, where it remains the prevailing rule. (*Grunewald* v. *United States* (1957) 353 U.S. 391, 396-397 [1 L.Ed.2d 931, 938-939, 77 S.Ct. 963, 62 A.L.R.2d 1344]; *People* v. *Zamora* (1976) 18 Cal.3d 538, 548 [134 Cal.Rptr. 784, 557 P.2d 75]; *People* v. *Crosby* (1962) 58 Cal.2d 713, 728 [25 Cal.Rptr. 847, 375 P.2d 839]; see generally, Annot. 62 A.L.R.2d 1369, 1371-1375.) Criminal conspiracy is a punishable offense *separate from the substantive crime to the commission of which the conspirators have agreed.* (Pen. Code, § 182.) At common law, criminal sanctions could be imposed even where the conspirators had taken no action to accomplish the unlawful purpose of the conspiracy. (See *Hyde* v. *United States* (1912) 225 U.S. 347, 359 [56 L.Ed. 1114, 1123, 32 S.Ct. 793].) Modern statutes require some "overt act" in furtherance of the conspiracy as an element of the crime (e.g., Pen. Code, § 184); the most frequently stated reason for this rule is that it permits a conspirator to repent and withdraw from the scheme before any decisive action is taken. (E.g., *People* v. *Olson* (1965) 232 Cal.App.2d 480, 490 [42 Cal.Rptr. 760].) However, the substantive crime need not have been completed, nor must the "overt act" itself be criminal, because it is the agreement itself which forms the basis of prosecution. (*People* v. *Saugstad* (1962) 203 Cal.App.2d 536, 540 [21 Cal.Rptr. 740]; *People* v. *Reed* (1961) 188 Cal.App.2d 395,

407 [10 Cal.Rptr. 536]; *People* v. *Klinkenberg* (1949) 90 Cal.App.2d 608, 635-636 [204 P.2d 47, 613]; *People* v. *Corica* (1942) 55 Cal.App.2d 130, 134 [130 P.2d 164].)

As we explained in *Zamora,* the "last overt act" rule in criminal conspiracy thus arises from an analytical focus on the *continuation of the unlawful agreement* as a criminal offense *in and of itself.* (18 Cal.3d at pp. 548-549, fn. 7.) Where the purposes of the conspiracy can be consummated, if at all, only by successive acts over a period of time, the *crime* of conspiracy is deemed a "continuing" one; the successive "overt acts" in furtherance of the unlawful agreement "mark the duration, as well as the scope" of the crime. (*Fiswick* v. *United States* (1946) 329 U.S. 211, 216 [91 L.Ed. 196, 200, 67 S.Ct. 224]; see *Yates* v. *United States* (1957) 354 U.S. 298, 334 [1 L.Ed.2d 1356, 1384, 77 S.Ct. 1064].)

Civil conspiracy, on the other hand, has experienced an entirely different and separate development. (*de Vries* v. *Brumback* (1960) 53 Cal.2d 643, 649-650 [2 Cal.Rptr. 764, 349 P.2d 532].) The gist of an action charging civil conspiracy is not the agreement itself, but the damage suffered as the result of a tort or torts committed in furtherance of the joint design. No conspiracy, however atrocious, gives rise to any civil cause of action unless an underlying civil wrong, resulting in damage, is alleged and proven. (*Unruh* v. *Truck Insurance Exchange* (1972) 7 Cal.3d 616, 631 [102 Cal.Rptr. 815, 498 P.2d 1063]; *Chicago Title Ins. Co.* v. *Great Western Financial Corp.* (1968) 69 Cal.2d 305, 316 [70 Cal.Rptr. 849, 444 P.2d 481]; *Orloff* v. *Metropolitan Trust Co.* (1941) 17 Cal.2d 484, 488 [110 P.2d 396].) Allegations of conspiracy add nothing whatever that is substantive to a civil complaint; their only purpose is to permit joinder as defendants of all parties who agreed to the tort, regardless of whether they directly participated in its commission. (*Mox Incorporated* v. *Woods* (1927) 202 Cal. 675, 677-678 [262 P. 302]; *Wise* v. *Southern Pacific Co.* (1963) 223 Cal.App.2d 50, 64 [35 Cal.Rptr. 652].) The applicable statute of limitations for a civil conspiracy is that for the underlying tort. (*Kenworthy* v. *Brown* (1967) 248 Cal.App.2d 298, 301 [56 Cal.Rptr. 461]; *Agnew* v. *Parks* (1959) 172 Cal.App.2d 756, 765 [343 P.2d 118].)

These long established principles were applied by us in *Bowman* v. *Wohlke* (1913) 166 Cal. 121 [135 P. 37], to prevent the improper inclusion of separate torts in a single complaint under a "conspiracy" theory. There, plaintiffs joined claims for injury to person, property, and reputation, then generally not permitted under former Code of Civil

Procedure section 427. (But see Code Civ. Proc., § 427.10.) When defendants appealed the verdict and denial of their new trial motion on grounds of misjoinder, plaintiffs asserted that such separate claims could be combined since the various torts alleged had been committed pursuant to a continuing conspiracy against them.

We rejected that view. "[I]t has been said," we observed, "that 'the allegation and proofs of a conspiracy in an action of this character is [*sic*] only important to connect a defendant with a transaction and to charge him with the acts and declarations of his co-conspirators, where otherwise he could not have been implicated.' (*Brackett* v. *Griswold*, 112 N.Y. 454, . . . See, also, 8 Cyc. 647; *Doremus* v. *Hennessey*, 62 Ill.App. 391.) The effect of this well-settled doctrine in so far as the case before us is concerned is clear. The complaint alleged various causes of action for different torts, all committed, it is true, in pursuance of a single conspiracy, but each, nevertheless, giving rise to a separate cause of action for the injury caused by the particular wrongful act. Whether or not the various causes of action could properly be united depended on our statutes relating to the joinder of causes of action in one complaint." (P. 126.)

*Bowman* thus represents this court's clear view, not heretofore repudiated, that allegations of civil "conspiracy" do not change the legal nature and effect of causes of action for the separate underlying torts. Nonetheless, the majority, in a footnote, dismisses *Bowman* as inapposite. Rather, it relies upon a Court of Appeal decision, *Schessler* v. *Keck* (1954) 125 Cal.App.2d 827 [271 P.2d 588]. There, plaintiff sued three defendants for slanderous remarks allegedly made by them over a period of several years. She asserted that the remarks were part of a conspiracy to injure her in her profession. Only one of the publications had occurred within the one-year limitations period normally applicable to defamation actions. (Code Civ. Proc., § 340, subd. 3.) The two defendants to whom the earlier statements were attributed successfully demurred on grounds of the statute. The Court of Appeal reversed the judgment of dismissal.

Citing *People* v. *Hess* (1951) 104 Cal.App.2d 642 [234 P.2d 65], a criminal case, as its sole primary authority, the *Schessler* court concluded that the conspiracy allegations permitted suit against all defendants on all publications, since the statute did not begin to run on any of the torts until there was "a cessation of the wrongful acts committed in furtherance of the conspiracy." (125 Cal.App.2d at p. 832.) This doctrine has

concededly been acknowledged in a number of subsequent California appellate decisions. (E.g., *Bedolla* v. *Logan & Frazer* (1975) 52 Cal.App.3d 118, 136 [125 Cal.Rptr. 59] [finding "last overt act" occurred outside limitation period]; *Kenworthy* v. *Brown, supra,* 248 Cal.App.2d 298, 302 [same]; see *Filice* v. *Boccardo* (1962) 210 Cal.App.2d 843, 846 [26 Cal.Rptr. 789].)

Recognizing the confusion and potential abuse inherent in the *Schessler* rule, however, other districts of the Court of Appeal have resisted its full implications. In *Agnew* v. *Parks, supra,* 172 Cal.App.2d 756, for example, it was held that, despite allegations of "conspiracy," the statute of limitations runs separately on each "separate, distinct and complete" act which violates the rights of another. *Schessler* was not mentioned. (P. 765.)

As the majority indicates, *Agnew* found plaintiff's claim barred because her complaint revealed that the last "fraudulent" act therein alleged had occurred more than three years before suit was commenced. (P. 766.) Read in context, however, this holding only reaffirms the unassailable principle that an action for fraud, even if joined with conspiracy claims, must be filed within three years after the act constituting "fraud" takes place. (See Code Civ. Proc., § 338, subd. 4.) *Agnew* does not support a rule that commencement of the statute of limitations for *all* tortious acts in a conspiracy is blindly deferred until commission of the last "overt" act in the conspiracy.

More recently, in *Rodriguez* v. *North American Aviation, Inc.* (1967) 252 Cal.App.2d 889 [61 Cal.Rptr. 579], another conspiracy case involving multiple slander, the court applied the "last overt act" rule at the pleading stage, but only because it concluded that the complaint essentially sought damages only for the most recent, still timely publication. Significantly, and voicing its doubts, the *Rodriguez* court observed: "We have not been cited any case, nor has our research produced one, in which one overt act committed within the statutory period and one prior thereto executed in pursuance of a conspiracy, have been considered in relation to the statute of limitations, except *Schessler* v. *Keck, supra,* and in that case the issue is not clear-cut . . . . [¶] If . . . plaintiff were to . . . seek recovery [for damages] . . . resulting from separate and completed acts of slander committed before the statutory period, it is doubtful that the action as to such acts and damages could escape the bar of the statute of limitations." (Pp. 893-894.)

The majority suggests that appellants' acts may be linked by the conspiracy into a "continuing wrong," thereby tolling the statute of limitations until appellants' tortious conduct finally ceased. For several reasons, I disagree.

First, the majority's proposal ignores the well settled principle, discussed above, that the focus of a civil conspiracy action is indeed upon the separate torts, not the "continuing" nature of the scheme itself. Despite the majority's protestations to the contrary, acceptance of any "last overt act" rule amounts to a concession that the continuing unlawful scheme is in itself a tort. This is clearly *not* the law (*Bowman* v. *Wohlke, supra,* 166 Cal. 121, 126), and the majority errs in characterizing the fraud as "a continuing wrong" (*ante,* pp. 787-788). Rather, there were several, separate, successive tortious acts, each one independently actionable.

Second, contrary to the majority's suggestion, a "continuing wrong" doctrine is not justified by the equitable considerations raised in its defense. Rules in this area seek to balance "the practical purposes that a statute of limitations serves in our legal system"—i.e., avoidance of stale and open-ended claims—against "the practical needs of prospective plaintiffs"—i.e., preservation of an effective remedy for wrongful conduct. (*Davies* v. *Krasna* (1975) 14 Cal.3d 502, 512 [121 Cal.Rptr. 705, 535 P.2d 1161, 79 A.L.R.3d 807].) Accordingly, the law has developed numerous general safeguards, applicable to "conspiratorial" and "non-conspiratorial" torts alike, to assure that the strong public policies represented by the statute of limitations do not foreclose a plaintiff's remedy for wrongs committed against him. For example, the statute of limitations on any claim is deferred until a cause of action has "accrued." (Code Civ. Proc., § 312.) This occurs, at the earliest, when some "actual and appreciable damage" has resulted from a defendant's wrongful act. (*Davies* v. *Krasna, supra,* 14 Cal.3d at pp. 513-514; *Budd* v. *Nixen* (1971) 6 Cal.3d 195, 200 [98 Cal.Rptr. 849, 491 P.2d 433].) Moreover, in appropriate cases, "accrual" may be further delayed until actual or constructive *discovery* of the claim (e.g., Code Civ. Proc., §§ 338, subd. 4 [fraud], 340.5 [medical malpractice]; *Neel* v. *Magana, Olney, Levy, Cathcart & Gelfand* (1971) 6 Cal.3d 176, 194 [98 Cal.Rptr. 837, 491 P.2d 421] [legal malpractice]; *Coots* v. *Southern Pacific Co.* (1958) 49 Cal.2d 805, 810 [322 P.2d 460] progressive industrial condition leading to disability; statute commences when disability occurs]; *Avner* v. *Longridge Estates* (1969) 272 Cal.App.2d 607, 616 [77 Cal.Rptr. 633] latent defects in

subdivision lot]; *Howe v. Pioneer Mfg. Co.* (1968) 262 Cal.App.2d 330, 348 [68 Cal.Rptr. 617] [latent product defect].)

Each of these doctrines deals directly with the "practical problems of prospective plaintiffs" in asserting an effective remedy for damage wrongfully caused by another. They ensure that the limitations period will not run before an injured party has had a realistic opportunity to sue. In contrast, the "last overt act" doctrine operates mechanically, without reference to plaintiff's diligence, affording plaintiff the bonanza of a tolled statute for torts upon which he long since could have commenced suit.

Indeed, the majority so applies the rule here. Apparently conceding respondents' *April 1970 discovery* of appellants' previous tortious conduct, the majority would *nonetheless* toll the statute in spite of full discovery so long as unsophisticated plaintiffs continue to suffer the *effects* of the fraud. (*Ante,* pp. 787-788.) For obvious reasons, this novel theory is clearly contrary to prior California law, as the majority elsewhere (*ante,* pp. 788, 789) acknowledges (*Davies v. Krasna, supra,* 14 Cal.3d 502, 514; *Teitelbaum v. Borders* (1962) 206 Cal.App.2d 634, 637-638 [23 Cal.Rptr. 868]), and notions of fundamental fairness do not compel its adoption. Discovery of a cause of action necessarily implies the ability to act in vindication of one's legal rights. (See, e.g., *Sanchez v. South Hoover Hospital* (1976) 18 Cal.3d 93, 101-103 [132 Cal.Rptr. 657, 553 P.2d 1129].)

The most fundamental difficulty with the "last overt act" rule, of course, is its fortuitous and random inequity. Where a *single* defendant is involved, plaintiff may clearly not avoid the statute of limitations on an earlier tort by waiting to commence suit until further tortious acts of the defendant have produced even greater damage. (*Davies v. Krasna, supra,* 14 Cal.3d at pp. 512-515.) There appears absolutely no reason why a different rule should apply simply because two or more persons "conspired" to commit the identical wrongs. On policy grounds plaintiffs should be encouraged to nip "conspiracies" in the bud. The "last overt act" rule applied to civil wrongs, on the other hand, encourages injured parties to sit by until the conspiratorial scheme has operated with full force and has run its extended ultimate course. The statute of limitations on each of the precedent causes of action which have fully accrued is meanwhile suspended in midair, as it were. Such a rule makes no sense, and defeats the purposes of the statute of limitations while serving no legitimate needs of injured plaintiffs.

Contrary to the majority's suggestion the statute of limitations is not intended primarily to confer "repose" on deserving defendants. Its most important function, one the majority declines to analyze, is to avoid the problems of proof inherent in actions based on incidents long past. (*Davies* v. *Krasna, supra*, 14 Cal.3d at p. 512; *Elkins* v. *Derby* (1974) 12 Cal.3d 410, 417 [115 Cal.Rptr. 641, 525 P.2d 81, 71 A.L.R.3d 839].) By the time this action was filed in July 1973, acts occurring seven years before may well have receded in the memories of available witnesses. In fact, only one witness to the actual conspiracy was presented at trial. The instant case thus illustrates, rather than refutes, the need for certitude in the application of a statute of limitations.

It has been said that the numerous decisions of other jurisdictions on this issue present "a melange of inconsistent, irreconcilable, even contradictory statements of general 'rules' relating to the subject." (Annot. 62 A.L.R.2d 1369, 1385.) My examination of these authorities fails to persuade me of the efficacy of a "last overt act" rule. The better reasoned view, I think, is that which is expressed in *Universal Film Exchanges* v. *Swanson* (D.Minn. 1958) 165 F.Supp. 95. There, the court succinctly repudiated the notion that separate torts may be "welded" into a single claim under the "hammer" of conspiracy allegations. (P. 98.)

I therefore reject the majority's conclusion that the statute of limitations for separate tortious acts committed pursuant to a civil "conspiracy" is tolled until the "last overt act" in the conspiracy. Rather, the limitations period should be deemed to commence for each underlying tort when, a known injury to plaintiff occurring, a cause of action has "accrued" thereon according to the rules normally applicable, and in no event later than plaintiffs' discovery of grounds for a cause of action. I would, accordingly, cling to our earlier *Bowman* rationale and disapprove *Schessler* v. *Keck, supra*, to the extent that it conflicts with these views.

Since the evidence before us would justify a finding that causes of action based on the 1966 loan "accrued" and were discovered no later than April 1970, more than three years prior to suit, appellants were entitled to instructions on the statute of limitations *as to those claims.* On the other hand, respondents' claims that late charges were improperly extracted on the *1970* loan appear to have been asserted in timely fashion. Discovery and damage with respect to these fraudulent acts could not have arisen until March or April 1973, when plaintiffs were again faced

with an unexpectedly high balloon payment. Suit was filed within three to four months thereafter. Accordingly, as a matter of law, this latter claim is not barred.

I would reverse the judgment.

Clark, J., concurred.

Appellants' petition for a rehearing was denied September 12, 1979. Clark, J., and Richardson, J., were of the opinion that the petition should be granted.