Filed 3/27/15  Primex Farms v. Roll Global CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| PRIMEX FARMS, LLC,<br><br>    Plaintiff and Appellant,<br><br>       v.<br><br>ROLL GLOBAL, LLC et al.,<br><br>    Defendants and Respondents. | F066780<br><br>(Super. Ct. No. 10CECG01114)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Donald S. Black, Judge.

Whelan Law Group, Walter W. Whelan, Brian D. Whelan and Lucas C. Whelan; McCormick Barstow et al., Todd W. Baxter and Scott Reddie for Plaintiff and Appellant.

Horvitz & Levy, Barry R. Levy and Julie L. Woods; Roll Law Group, Kristina M. Diaz, Johnny Traboulsi, and J.P. Pecht for Defendants and Respondents.

-ooOoo-

Plaintiff Primex Farms, LLC (Primex), a California pistachio processor, sued defendants Roll International Corporation (Roll), Westside Mutual Water Company, LLC (WMWC), and Paramount Farming Company, LLC (Paramount Farming) for intentional and negligent interference with Primex's prospective economic advantage. Primex alleged the three defendants conspired to lure away the business of pistachio grower Chaparral Farms, Inc. (Chaparral) by offering to sell irrigation water in exchange for a long-term sales contract for pistachios—a "water for pistachios" deal—and, in doing so, interfered with Primex's existing business and contractual relationship with Chaparral. Primex further alleged that the sale of WMWC's irrigation water for profit to Chaparral, which was not a member of WMWC, was "independent wrongful conduct" because the conduct constituted a violation of the Public Utilities Code.

The trial court entered a judgment for defendants after granting their motion for directed verdict. The court found Primex's claims were barred by the applicable two-year statute of limitations because Primex knew or suspected all the elements of the claims by the end of August 2007, but did not commence this action until March 2010. Previously, the court ruled that Primex's conspiracy allegations failed under the agent's immunity rule.

Primex maintains that its tort claims were timely and raises three arguments in support of its position: (1) the trial court erred in striking the civil conspiracy allegations, and the limitations period could only begin when the last overt act in furtherance of the conspiracy occurred, which Primex alleged was in November 2008; (2) Primex is entitled to the benefit of the discovery rule so that the limitations period only began to run when it discovered that defendant WMWC sold irrigation water to Chaparral in violation of the Public Utilities Code; and (3) the claims did not accrue until WMWC actually delivered water to Chaparral, and this did not occur until the summer of 2008.

We conclude Primex's claims are untimely and affirm the judgment.

2.

# FACTS AND PROCEDURAL HISTORY

## Background

Primex, which is owned by Ali Amin and his wife, has been in the business of processing pistachios for pistachio growers in California since 2002. From 2002 until 2006, pistachio grower Chaparral sold its pistachio crops to Primex for processing. In October 2006, Chaparral's farm manager, Bill Klepper, signed a three-year contract with Primex to deliver its crops to Primex for 2006, 2007, and 2008. In July 2007, however, Chaparral entered into another three-year contract to sell all of its crops harvested in 2007, 2008, and 2009 to Cal Pure Pistachios, Inc. (Cal Pure). This contract was signed by Chaparral's owner, M.T. Alaghbandian.

Alaghbandian lived in Iran. Amin's family knew Alaghbandian's family, and Amin's uncle had a friendship with Alaghbandian going back many years. Amin and his family were also pistachio growers with about 4,000 acres of orchards in Kern and Madera Counties in 2007. Klepper worked as the farm manager for Amin's orchards from 1989 until his death in 2008.[1]

## Prior lawsuit

In an earlier lawsuit (the Chaparral case), Primex sued Chaparral for breach of contract based on Chaparral's failure to deliver to Primex its 2007 and 2008 pistachio crops. Primex filed its original complaint in the Chaparral case on August 31, 2007. In the original complaint, Primex also sued Cal Pure, asserting claims of interference with contract and interference with economic advantage. In an amended complaint filed in September 2008, Primex added Paramount Farms, Inc. (Paramount Farms) as a defendant, alleging that Paramount Farms was the dominant grower and processor of pistachios in California and was the parent corporation of Cal Pure. Primex alleged that Paramount Farms, "[d]irectly and through entities and instrumentalities that it controls"

---

[1] These background facts are based on Primex's allegations and Amin's trial testimony and are not in dispute.

"maintained a dominant share of water entitlements at water banks in Kern and Fresno Counties." Primex further alleged that Cal Pure and Paramount Farms conspired to coerce pistachio growers to switch processors and do business with Paramount Farms or Cal Pure "in return for Paramount [Farms] delivering to the coerced growers irrigation water that is in short supply and in high demand." Primex asserted claims of interference with contract, interference with economic advantage, unfair business practices, and violations of the Cartwright Act (Bus. & Prof. Code § 16700 et seq.) for reciprocal dealing and tying arrangement against both Cal Pure and Paramount Farms (the Paramount I defendants).[2]

In the Chaparral case, the trial court granted the Paramount I defendants' motion for summary judgment on February 25, 2010. The court found there was no triable issue as to whether the Paramount I defendants had knowledge of (1) Chaparral's three-year contract with Primex (an element necessary to prove the claim for intentional interference with contract) or (2) "the pre-existing business relationship, with the probability of future economic benefit, between Primex and Chaparral" (an element necessary to prove the claim for interference with prospective economic advantage).[3]

---

[2] According to the declaration of Stewart Resnick, he and his wife Lynda Resnick were trustees of the Stewart and Lynda Resnick Revocable Trust, which owned various farming and business entities. As the trustees of the trust, the Resnicks were the indirect owners of defendants Roll and Paramount Farming and they indirectly owned 98 percent of defendant WMWC. The Resnicks were also the indirect owners of Paramount Farms, and Stewart Resnick was the chairman of the board, chief executive officer, and president of Cal Pure, which was a nonprofit agricultural cooperative association. Defendants in the current case note that the parties often referred to the defendants in the Chaparral case (excluding Chaparral) and the defendants in the current case collectively as "Paramount." We will refer to Cal Pure and Paramount Farms (the Paramount-related entities in the Chaparral case) collectively as the "Paramount I defendants," and we sometimes refer to the three defendants in the current case collectively as the "Paramount II defendants."

[3] The court wrote in its tentative ruling, which it later adopted, "Th[e] evidence [submitted by the parties] negates the element of knowledge of the Primex contract or knowledge of the pre-existing business relationship, with the probability of future economic benefit, between Primex and Chaparral."

Earlier in February 2010, the Paramount I defendants made an offer under Code of Civil Procedure section 998 to settle the case for $10,000. The day after the trial court ruled on the summary judgment motion, Primex's attorney signed the written section 998 offer in acceptance of the offer. The Paramount I defendants objected to enforcement of the section 998 agreement, arguing that their offer expired by operation of law when the court granted summary judgment. The trial court rejected the Paramount I defendants' argument and enforced the section 998 agreement. A judgment in the amount of $10,000 against the Paramount I defendants was filed on March 2, 2010.

Primex's contract claim against Chaparral went to jury trial, and Primex won a $3.4 million judgment. This court affirmed the judgment against Chaparral on appeal. (See *Primex Farms, LLC v. Chaparral Farms, Inc.* (Oct. 23, 2012, F060514 [nonpub. opn.], p. 2.)

*Current lawsuit*

On March 29, 2010, Primex filed its initial complaint in this case. The third amended complaint, which is the operative complaint, was filed in July 2011. Primex alleged that by the spring of 2007, the Paramount II defendants "developed a plan to target certain pistachio growers in California to entice them to sell all or, at least, a larger percentage of their pistachio crops to Paramount,[4] which would result in reduced amounts of pistachios processed by [Primex] and other competing processors and more profit for Defendants." Specifically with respect to Chaparral, Primex alleged the Paramount II defendants "interfered with the business relationship between [Primex] and Chaparral and the prospective economic advantage that such relationship afforded [Primex] by causing Chaparral to sever its business relationship with Primex and to enter into a conflicting three-year contract with Cal Pure," and Chaparral's 2007 and 2008 pistachio crops were delivered to Cal Pure instead of Primex.

---

[4]     "Paramount" was not defined in the complaint. As defendants note, the parties used the term "Paramount" to refer to defendants collectively. See footnote 2, *ante*.

Primex asserted claims of intentional and negligent interference with prospective economic advantage and alleged a "civil conspiracy to interfere with prospective economic advantage against all defendants." (Capitalization omitted.)

In April 2012, the trial court ordered trial to proceed in three phases. In the first phase, the court would try issues related to the Paramount II defendants' affirmative defense that the applicable statute of limitations barred Primex's claims. The third phase would address the issue whether the Paramount II defendants committed an "'independently wrongful act,'" including whether various provisions of the Public Utilities Code were violated. The second phase would try all remaining issues not set for trial in the first or third phase. These issues would include the elements of knowledge, intent, and causation as to the claims of intentional and negligent interference with prospective economic advantage.

*Judgment on the pleadings with respect to conspiracy allegations*

On October 30, 2012, the Paramount II defendants filed a motion for nonstatutory judgment on the pleadings. They argued, among other things, that the agent's immunity rule rendered Primex's conspiracy allegations meritless as a matter of law. On November 30, 2012, the trial court granted the motion for judgment on the pleadings as to the conspiracy allegations, agreeing with the Paramount II defendants that the conspiracy allegations were "barred by the agent's immunity rule."

*Trial on statute-of-limitations affirmative defense*

In late November 2012, a jury trial began on the first phase of trial, the statute-of-limitations defense.

Amin testified that pistachio processors were talking about Paramount offering water to growers to try to sign them up for processing contracts. In the spring of 2007, this talk was widespread among the other six large pistachio processors in California.[5]

---

[5] Amin testified there were seven large pistachio processors in California. Paramount was the largest processor in California and Primex was ranked third or fourth.

6.

Amin had never heard of processors offering water for sale before. He testified, "I thought it was wrong and, you know, obviously, it was a competitive advantage that we didn't have, we didn't have water to sell." In the spring of 2007, Amin suspected that Paramount was, in fact, offering growers water in exchange for providing their pistachios to Paramount. He agreed that, by late spring of 2007, it was "common knowledge in the industry" (among processers and growers) that Paramount was offering water to growers in return for the growers selling their crops to Paramount. One particular pistachio grower, Larry Easterling, previously told Amin he intended to split his 2007 crop among three processors and give 20 or 30 percent to Primex. In July 2007, however, Easterling was apologetic and told Amin that he needed water because of the drought and Paramount was offering water. As a result, Easterling was not going to deliver any portion of his crop to Primex.

Amin had family in Iran, and he would travel to Iran at least once a year. Before the Chaparral lawsuit, Amin would visit Chaparral's owner, Alaghbandian, during his trips to Iran, and Alaghbandian "was always very praising of [Amin] and expressed his gratitude towards all [Amin] did for Chaparral to help them." During a visit in October 2006, Alaghbandian told Amin, "'You will always have our crop.'"

In early August 2007, Amin learned from Klepper, Chaparral's farm manager, that Chaparral had a contract to deliver its 2007 pistachio crop to Paramount. This was a surprise to Amin. He was not aware of any issue between Chaparral and Primex over price. Other pistachio processors reported to Amin that, for the 2007 crop, they also lost growers or portions of growers' acreage they used to receive because of Paramount's offer of water.

At the time Primex sued Chaparral for breach of contract, Amin believed that Paramount had offered water as an inducement for Chaparral to sell its pistachio crop to Paramount.

*Directed verdict on statute of limitations*

On December 6, 2012, the parties finished presenting evidence on the first phase of trial, and the Paramount II defendants filed a motion for directed verdict. They argued the evidence at trial established that Primex suspected and believed in 2007 that Paramount's use of irrigation water to entice Chaparral was the only reason to explain why Chaparral chose to deliver its crop to Paramount instead of Primex. They argued Primex's claims for intentional and negligent interference with prospective economic advantage accrued by the time the Chaparral lawsuit was filed in August 2007 and, therefore, the claims were barred by the two-year statute of limitations.

The trial court granted the motion. The court found the clear, uncontradicted evidence adduced through Amin's testimony showed that Primex's claims accrued no later than August 31, 2007, "because by that time [Primex] indisputably knew or suspected the existence of all of the elements of the claim[s] and [Primex] … neither plead[ed], nor produced any substantial evidence in support of a claim that it did not by that time have a factual basis for the claim[s]." The court concluded, "Because this case was not filed until March 29, 2010, more than two years after [Primex's] claims accrued, it is barred by the statute of limitations."

A judgment in favor of the Paramount II defendants was filed on December 10, 2012.

## DISCUSSION

### I. Standards of review

We review de novo a trial court's ruling on a motion for directed verdict. (*Brassinga v. City of Mountain View* (1998) 66 Cal.App.4th 195, 210.) "'[T]he power of the court to direct a verdict is absolutely the same as the power of the court to grant a nonsuit.' [Citation.] 'A motion for a directed verdict "is in the nature of a demurrer to the evidence … and concedes as true the evidence on behalf of the adverse party, with all fair and reasonable inferences to be deduced therefrom."' [Citation.]" (*Ibid.*)

8.

"An order granting a motion for directed verdict is only permissible when there is no substantial conflict in the evidence. 'In ruling on the motion, the court *does not consider credibility of witnesses* but gives to the evidence of the party against whom it is directed *all its legal value*, indulges every legitimate *inference* from such evidence in favor of that party, and *disregards conflicting evidence*.' [Citation.]" (*McNall v. Summers* (1994) 25 Cal.App.4th 1300, 1307, quoting 7 Witkin, Cal. Procedure (3d ed. 1985) Trial, §§ 409–410, pp. 412–413.)

We also review de novo a trial court's order granting a motion for judgment on the pleadings. (*Gerawan Farming, Inc. v. Lyons* (2000) 24 Cal.4th 468, 515.) "All properly pleaded, material facts are deemed true, but not contentions, deductions, or conclusions of fact or law; judicially noticeable matters may be considered." (*Kapsimallis v. Allstate Ins. Co*. (2002) 104 Cal.App.4th 667, 672.)

## II.    *Statute of limitations*

Civil actions "can only be commenced" within the applicable statute of limitations "after the cause of action shall have accrued." (Code Civ. Proc., § 312.) In this case, defendants properly raised the statute of limitations as an affirmative defense. (See *Norgart v. Upjohn Co*. (1999) 21 Cal.4th 383, 396 (*Norgart*).) The statute of limitations for claims of intentional and negligent interference with prospective economic advantage is two years. (Code Civ. Proc., § 339; *Augusta v. United Service Automobile Assn*. (1993) 13 Cal.App.4th 4, 10; see *Edwards v. Fresno Community Hosp*. (1974) 38 Cal.App.3d 702, 706.) The issue in the first phase of trial was whether Primex commenced its lawsuit against the Paramount II defendants within two years after its tort claims accrued.

"Generally speaking, a cause of action accrues [and the statute of limitations begins to run] at 'the time when the cause of action is complete with all of its elements.' [Citations.]" (*Fox v. Ethicon Endo-Surgery, Inc*. (2005) 35 Cal.4th 797, 806–807 (*Fox*).)

We begin with a brief description of the elements of the claims Primex asserted to determine when the claims accrued.

The elements of the tort of intentional interference with prospective economic advantage are "'"(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." [Citations.]' [Citation.]" (*Korea Supply Co. v. Lockheed Martin Corp*. (2003) 29 Cal.4th 1134, 1153 (*Korea Supply*).) As part of the third element of the tort, "a plaintiff must [also] plead and prove that the defendant's acts are wrongful apart from the interference itself." (*Id*. at p. 1154.)

"The tort of negligent interference with prospective economic advantage is established where a plaintiff demonstrates that (1) an economic relationship existed between the plaintiff and a third party which contained a reasonably probable future economic benefit or advantage to [the] plaintiff; (2) the defendant knew of the existence of the relationship and was aware or should have been aware that if it did not act with due care its actions would interfere with this relationship and cause [the] plaintiff to lose in whole or in part the probable future economic benefit or advantage of the relationship; (3) the defendant was negligent; and (4) such negligence caused damage to [the] plaintiff in that the relationship was actually interfered with or disrupted and [the] plaintiff lost in whole or in part the economic benefits or advantage reasonably expected from the relationship." (*North American Chemical Co. v. Superior Court* (1997) 59 Cal.App.4th 764, 786.) As with the intentional tort, the defendant's conduct must be independently wrongful apart from the interference itself. (*Lange v. TIG Ins. Co.* (1998) 68 Cal.App.4th 1179, 1187.)

Here, Primex alleged the Paramount II defendants "interfered with the business relationship between [Primex] and Chaparral and the prospective economic advantage that such relationship afforded [Primex] by causing Chaparral to sever its business relationship with Primex and to enter into a conflicting three-year contract with Cal Pure." The interfering conduct allegedly occurred in the spring and summer of 2007, when the Paramount II defendants began enticing Chaparral and other growers to sell their crops to Paramount by offering to sell irrigation water in exchange for long-term contracts with Paramount. The economic harm or damage to Primex allegedly caused by the interference was the loss of Chaparral's processing business.

The evidence at trial showed that Amin heard in the spring of 2007 about Paramount offering water to growers, he learned in early August 2007 that Chaparral was not going to deliver its crop to Primex, and Primex sued Chaparral for breach of contract and Cal Pure for interference with contract and economic advantage on August 31, 2007. Thus, by August 31, 2007, Primex was sufficiently certain that it was not going to receive Chaparral's 2007 pistachio crop due to wrongful conduct by a Paramount I defendant to file a lawsuit. Chaparral's 2007 crop ultimately was not delivered to Primex, but was delivered to Cal Pure.

From the undisputed evidence and Primex's own allegations, the alleged tortious conduct (luring away Chaparral's processing business) and resulting harm (loss of Chaparral's 2007 pistachio crop) occurred by August 31, 2007, when Primex commenced the Chaparral case. Primex's current claims for intentional and negligent interference with prospective economic advantage accrued by that date as they were "'complete with all of [their] elements.'" (*Fox*, *supra*, 35 Cal.4th at p. 806.) The current lawsuit was filed on March 29, 2010, outside the two-year statute of limitations. Accordingly, it appears that Primex's claims were barred by the statute of limitations and the motion for directed verdict was properly granted.

11.

Primex, however, contends their claims were timely because they did not accrue until a later time—either when Chaparral received water from defendant WMWC or when Primex learned that a "mutual benefit water company" was the source of the water being offered to entice growers. We consider each of Primex's contentions.

### III. Conspiracy allegations

Primex's first contention is that the trial court erred in granting the motion for judgment on the pleadings because the conspiracy allegations were not barred by the agent's immunity rule. This claimed error, in turn, affected Primex's ability to respond to the statute-of-limitations affirmative defense. Without the conspiracy allegations, Primex could not invoke the last overt act doctrine to prove that its claim for intentional interference with prospective economic advantage was timely. (See *Wyatt v. Union Mortgage Co.* (1979) 24 Cal.3d 773, 786 (*Wyatt*).)

#### A. Civil conspiracy

"Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration. [Citation.] By participation in a civil conspiracy, a coconspirator effectively adopts as his or her own the torts of other coconspirators within the ambit of the conspiracy. [Citation.] In this way, a coconspirator incurs tort liability co-equal with the immediate tortfeasors." (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 510–511 (*Applied Equipment*).)

"Standing alone, a conspiracy does no harm and engenders no tort liability. It must be activated by the commission of an actual tort." (*Applied Equipment*, *supra*, 7 Cal.4th at p. 511.) "'[I]t is the acts done and not the conspiracy to do them which should be regarded as the essence of the civil action.' [Citation.]" (*Ibid*.)

Primex alleged the Paramount II defendants engaged in a civil conspiracy to interfere with prospective economic advantage by taking away the processing business Primex otherwise would have received from Chaparral. Primex alleged:

> "In doing the things alleged herein, Defendants, and each of them, acted in furtherance of their joint civil conspiracy to commit the tort of intentionally interfering with the prospective economic advantage between [Primex] and its grower, Chaparral. As alleged, the conduct of each of the conspirators constituted a breach of their own individual duties not to engage in intentional interference with prospective economic advantage and each conspirator engaged in independent wrongful conduct (a necessary element of that tort) by selling irrigation water above cost to a non-member entity … and by aiding and abetting WMWC, a public utility, to violate the Public Utilities Code and public utilities rules and regulations .… The goal of said civil conspiracy was ultimately achieved—Defendants caused Chaparral to switch its processing business from [Primex] to Cal Pure starting in September 2007 and continuing through the present." (Boldface & fn. omitted.)

## B. *Agent's immunity rule*

In granting defendants' motion for judgment on the pleadings as to the civil conspiracy allegations, the trial court relied on the agent's immunity rule. As described by the California Supreme Court in *Applied Equipment*, this rule provides that "duly acting agents and employees cannot be held liable for conspiring with their own principals (the 'agent's immunity rule')." (*Applied Equipment*, *supra*, 7 Cal.4th at p. 512.) The court explained the rule further in footnote 4:

> "The agent's immunity rule emanates from a … holding in *Wise* [*v. Southern Pacific Co.* (1963) 223 Cal.App.2d 50, 72] that: 'Agents and employees of a corporation cannot conspire with their corporate principal or employer where they act in their official capacities on behalf of the corporation and not as individuals for their individual advantage.' [Citation.] The rule 'derives from the principle that ordinarily corporate agents and employees acting for or on behalf of the corporation cannot be held liable for inducing a breach of the corporation's contract since being in a confidential relationship to the corporation their action in this respect is privileged.' [Citation.] We have endorsed and applied the agent's immunity rule as expressed in *Wise* [citations]. Nothing in this decision is

13.

intended to abrogate or impair the agent's immunity rule." (*Applied Equipment*, *supra*, 7 Cal.4th at p. 512, fn. 4.)

Here, Primex alleged: "For the purposes of the facts alleged in this Complaint, [Primex] is informed and believes, and thereon alleges that WMWC, Roll and Paramount Farming are, and have been, at all relevant times, *agents*, instrumentalities, and joint venturers of each other and have been, at all relevant times, acting in concert with each other." (Italics added.) Further, Primex alleged that defendants Roll and Paramount Farms "engaged in independent wrongful acts *as agents of* WMWC, as specifically proscribed by Public Utilities Code §§ 2110 and 2112." (Italics added, boldface omitted.) As to this latter allegation, the court observed, "this is no 'stray' allegation, because it is necessary for [Primex's] theory that Roll and Paramount, as corporate 'agents' violated Public Utilities Code §§ 2110 and 2112."[6]

---

[6]    Public Utilities Code section 2110 provides: "Every public utility and every officer, *agent*, or employee of any public utility, who violates or fails to comply with, or who procures, aids, or abets any violation by any public utility of any provision of the California Constitution or of this part, or who fails to comply with any part of any order, decision, rule, direction, demand, or requirement of the commission, or who procures, aids, or abets any public utility in the violation or noncompliance in a case in which a penalty has not otherwise been provided, is guilty of a misdemeanor and is punishable by a fine not exceeding five thousand dollars ($5,000), or by imprisonment in a county jail not exceeding one year, or by both fine and imprisonment." (Italics added.)

This statute applies only to public utilities and officers, agents, and employees of public utilities. Accordingly, the trial court was correct to observe that an allegation of agency relationship (or officer status, employment, or that the defendant is a public utility) would be necessary to plead a violation of this statute.

Public Utilities Code section 2112, on the other hand, provides: "Every person who, either individually, or acting as an officer, *agent*, or employee of a corporation other than a public utility, violates any provision of this part, or fails to comply with any part of any order, decision, rule, direction, demand, or requirement of the commission, or who procures, aids, or abets any public utility in such violation or non-compliance, in a case in which a penalty has not otherwise been provided for such person, is guilty of a misdemeanor, and is punishable by a fine not exceeding one thousand dollars ($1,000), or by imprisonment in a county jail not exceeding one year, or by both such fine and imprisonment." (Italics added.)

Since this statute applies to persons who act individually to procure or aid or abet a Public Utilities Code violation, it appears that it is not necessary to allege an agency or other relationship to a public utility in order to plead a violation of this statute.

14.

"'Agents … cannot conspire with their corporate principal … where they act in their official capacities on behalf of the corporation and not as individuals for their individual advantage.' [Citation.]" (*Applied Equipment*, *supra*, 7 Cal.4th at p. 512, fn. 4.) Given Primex's allegations that defendants Roll and Paramount Farming were acting as agents of defendant WMWC when they committed their alleged misconduct, the agent's immunity rule means that defendants Roll and Paramount Farming could not conspire with their principal, WMWC.

Primex disagrees with this analysis of the agent's immunity rule. It asserts that footnote 8 of *Applied Equipment*, *supra*, 7 Cal.4th at page 520, established a broad exception to the agent's immunity rule whenever the agent or employee owes a separate duty to the plaintiff and this exception applied in this case. Defendants respond that footnote 8 had nothing to do with the agent's immunity rule and, therefore, did not create or recognize an exception to the rule.

Primex also argues the agent's immunity rule should not apply in this case because defendants Roll and Paramount Farming were acting "'as individuals for their individual advantage'" and not merely as agents of defendant WMWC. (See *Applied Equipment*, *supra*, 7 Cal.4th at p. 512, fn. 4.) Primex cites its allegations that defendant Roll was "either the holding company or the parent company of various 'Paramount-related' farming entities, including all of the entities that comprise the members of Defendant … WMWC" and that defendant Paramount Farming was a member of WMWC.[7] Defendants take the position that Primex's allegations are insufficient to preclude application of the agent's immunity rule. They argue Primex's allegations "fall[] notably short of pleading that any of the alleged 'profits' or monies made through the alleged interference were actually earned by any of the agent-defendants for their 'own personal

---

[7]   We note that Primex does not argue that the agent's immunity rule applies only to individuals and not to corporate entities.

advantage or gain' outside of the agency relationship rather than simply on behalf and for the benefit of their principal."

However, we need not decide whether *Applied Equipment* announced a broad exception to the agent's immunity rule or whether Primex's complaint sufficiently alleged the Paramount II defendants were acting for their individual advantage. This is because even if the conspiracy allegations had survived the motion for judgment on the pleadings, the allegations would not have affected the motion for directed verdict on the statute-of-limitations affirmative defense.

### C. *Last overt act doctrine and the primary purpose of the alleged conspiracy*

As we have mentioned, Primex is trying to revive its conspiracy allegations in order to argue that its claims were timely under the "last overt act" doctrine. Under this doctrine, "when a civil conspiracy is properly alleged and proved, the statute of limitations does not begin to run on any part of a plaintiff's claims until the 'last overt act' pursuant to the conspiracy has been completed." (*Wyatt*, *supra*, 24 Cal.3d at p. 786.) Primex contends that he should have been permitted to introduce evidence that the last overt act in furtherance of the alleged conspiracy in this case occurred in November 2008. According to the operative complaint, the second installment of WMWC irrigation water was delivered to Chaparral in November 2008. Primex alleged this water delivery was made "pursuant to an agreement first negotiated between Bert Steir and a Chaparral representative in the spring of 2007." Steir was identified in the complaint as a vice president and managing agent of defendant Roll.

Defendants respond that the conspiracy allegations would not have extended the limitations period because the last overt act cannot occur after the object of the conspiracy has been completed, and in this case, the alleged interference with Primex's business and contractual relationship with Chaparral occurred no later than 2007. We agree.

16.

"'[A]cts committed by conspirators subsequent to the completion of the crime which is the primary object of a conspiracy cannot be deemed to be overt acts in furtherance of that conspiracy. Consequently, upon successful attainment of the substantive offense which is the primary object of the conspiracy, the period of the statute of limitations for the conspiracy begins to run at the same time as for the substantive offense itself.'" (*State of California ex rel. Metz v. CCC Information Services, Inc.* (2007) 149 Cal.App.4th 402, 419.)

Amin learned in early August 2007 that Chaparral was not going to deliver its crop to Primex, and Primex sued Chaparral for breach of contract on August 31, 2007. Certainly by the end of 2007, the object of the alleged conspiracy to interfere with prospective economic advantage had been attained—Chaparral delivered its 2007 pistachio crop to Cal Pure rather than Primex. Since the goal of the conspiracy was achieved by the end of 2007, acts that occurred after that are not considered overt acts in furtherance of the conspiracy.

Primex's reply is not persuasive. It argues that defendants "do not get to define what the object of the conspiracy was when what is being contested on appeal is the Trial Court's granting of a motion for judgment on the pleadings." We do not believe the object of the alleged conspiracy is open to question. Conspiracy is not a cause of action; it is a theory for imposing liability for an underlying substantive tort. (*Applied Equipment*, *supra*, 7 Cal.4th at pp. 510–511.) The underlying tort in this case was intentional interference with prospective economic advantage. Primex specifically alleged, "The goal of said civil conspiracy was ultimately achieved—Defendants caused Chaparral to switch its processing business from [Primex] to Cal Pure starting in September 2007 and continuing through the present." In addition, when arguing pretrial evidentiary issues, Primex's attorney told the court, "The object of the conspiracy was to have Chaparral and growers leave their commitments to other [processors] and go to Paramount …." Primex cannot now seriously dispute that the object of the alleged

17.

conspiracy was interfering with its prospective economic advantage by taking away Chaparral's processing business, which was achieved when Primex lost Chaparral's 2007 pistachio crop.

Primex also asserts "what makes the sale for profit of irrigation water by WMWC to Chaparral unlawful is the *delivery* of such water at a price above cost. Thus, the object of the conspiracy, i.e., what made the conspiracy unlawful in the first place, must include delivery of the water which did not occur until the summer of 2008." (Italics added, underscoring omitted.) While Primex now takes the position that the only wrongful conduct was the *delivery* of water in the summer of 2008, in its complaint, Primex alleged that "*offering to sell*," as well as "selling irrigation water for profit … violated the law …." (Italics added, underscoring omitted.) Further, it makes no sense to say that the actual delivery of water in the summer of 2008 could have proximately caused Chaparral to breach its contract with Primex in 2007. Under Primex's theory of the case, it was the *offer* to sell irrigation water made in the spring or summer of 2007 that interfered with Primex's prospective economic advantage "by causing Chaparral to sever its business relationship with Primex and to enter into a conflicting three-year contract with Cal Pure …."

Having considered the conspiracy allegations and the evidence presented at trial on the statute-of-limitations affirmative defense, we conclude the last overt act doctrine could not apply to render Primex's alleged tort claims timely. In other words, the conspiracy allegations would not have changed the result on the motion for directed verdict on defendants' statute-of-limitations affirmative defense. As a result, even if we assume the trial court erred in granting the judgment on the pleadings as to the conspiracy allegations, Primex is not entitled to reversal. (See *Mike Davidov Co. v. Issod* (2000) 78 Cal.App.4th 597, 606 ["A reversible error only exists when it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of that error."].)

18.

## IV.    *Delayed discovery*

Primex next contends its tort claims were timely filed because the statute of limitations was tolled until it discovered the facts supporting its claim for interference with prospective economic advantage based on violations of the Public Utilities Code. We disagree.

### A.    *Discovery rule*

Generally, a cause of action accrues and the statute of limitations begins to run when the cause of action is complete with all of its elements. (*Fox*, *supra*, 35 Cal.4th at p. 806.) However, "[a]n important exception to the general rule of accrual is the 'discovery rule,' which postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action. [Citations.]" (*Id*. at p. 807.)

"A plaintiff has reason to discover a cause of action when he or she 'has reason at least to suspect a factual basis for its elements.'" (*Fox*, *supra*, 35 Cal.4th at p. 807, quoting *Norgart*, *supra*, 21 Cal.4th at p. 398.) "Under the discovery rule, suspicion of one or more of the elements of a cause of action, coupled with knowledge of any remaining elements, will generally trigger the statute of limitations period." (*Ibid*.) The "'elements'" of a cause of action refers to the "'generic'" elements of wrongdoing, causation, and harm. (*Ibid*.) The Supreme Court has explained: "In so using the term 'elements,' we do not take a hypertechnical approach to the application of the discovery rule. Rather than examining whether the plaintiffs suspect facts supporting each specific legal element of a particular cause of action, we look to whether the plaintiffs have reason to at least suspect that a type of wrongdoing has injured them." (*Ibid*.)

The fact that the plaintiff does not have reason to suspect a defendant's identity, however, does not delay the accrual of a cause of action. (*Fox*, *supra*, 35 Cal.4th at p. 807.) Further, "plaintiffs are required to conduct a reasonable investigation after becoming aware of an injury, and are charged with knowledge of the information that would have been revealed by such an investigation." (*Id*. at p. 808.)

19.

"[T]o rely on the discovery rule for delayed accrual of a cause of action, '[a] plaintiff whose complaint shows on its face that his claim would be barred without the benefit of the discovery rule must specifically plead facts to show (1) the time and manner of discovery *and* (2) the inability to have made earlier discovery despite reasonable diligence.' [Citation.] In assessing the sufficiency of the allegations of delayed discovery, the court places the burden on the plaintiff to 'show diligence'; 'conclusory allegations will not withstand demurrer.' [Citation.]" (*Fox*, *supra*, 35 Cal.4th at p. 808.)

In *Fox*, the plaintiff filed a medical malpractice lawsuit after she had severe complications following gastric bypass surgery. During discovery, the plaintiff learned that a medical device used during surgery may have malfunctioned and caused her injury. (*Fox*, *supra*, 35 Cal.4th at p. 802.) At the time of the plaintiff's injury, a claim of products liability was subject to a one-year statute of limitations. The plaintiff timely filed her initial medical malpractice lawsuit, but she filed her first amended complaint adding a cause of action for products liability against the manufacturer of the medical device more than a year after her injury. (*Id*. at p. 809.)

The manufacturer demurred to the amended complaint, arguing that the products liability claim was time-barred. In opposition, the plaintiff asserted she had no knowledge that the surgery involved the use of the medical device at issue, a stapler, and she also stated that she did not learn about the possibility of stapler malfunction until her attorney deposed the defendant doctor. (*Fox*, *supra*, 35 Cal.4th at p. 805.) The trial court sustained the demurrer without leave to amend. In doing so, the court relied on *Bristol-Myers Squibb Co. v. Superior Court* (1995) 32 Cal.App.4th 959, disapproved of in *Fox* at pages 803 and 805. The Court of Appeal reversed the trial court's order and instructed the trial court to grant the plaintiff leave to amend her complaint to allege facts explaining why she did not have reason to discover the factual basis of her products liability claim earlier. (*Fox*, *supra*, at p. 806.) "In so ruling, the Court of Appeal held

that *Bristol-Myers Squibb's* 'bright-line rule of imputed simultaneous discovery of causes of action' did not apply." (*Ibid.*)

The Supreme Court affirmed the appellate court's decision, agreeing that the plaintiff must be allowed to amend her complaint to plead facts supporting her claim that the discovery rule should apply in determining the timeliness of her products liability claim. (*Fox*, *supra*, 35 Cal.4th at p. 811.) The court noted the difference between a plaintiff's ignorance of the identity of a defendant and her ignorance of a generic element of a cause of action: "Although the identity of the manufacturer-wrongdoer is not an essential element of a products liability cause of action, and therefore ignorance of its identity will not delay the running of the statute of limitations [citation], a plaintiff's ignorance of wrongdoing involving a product's defect will usually delay accrual because such wrongdoing is essential to that cause of action." (*Id.* at p. 813.) The court then held, "[I]f a plaintiff's reasonable and diligent investigation discloses only one kind of wrongdoing when the injury was actually caused by tortious conduct of a wholly different sort, the discovery rule postpones accrual of the statute of limitations on the newly discovered claim." (*Ibid.*)

The Supreme Court distinguished the plaintiff's allegations in *Fox* from the facts of previous cases. For example, in *Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1114 (*Jolly*), "[t]he undisputed evidence … showed that, as of 1972, [the plaintiff] at least suspected that her condition was a result of her mother's ingestion of [the synthetic drug estrogen diethylstilbestrol (DES)]." (*Fox*, *supra*, 35 Cal.4th at p. 813.) Consequently, the Supreme Court "held that because the plaintiff at least suspected that DES was the cause of her injuries as of 1972, the statute of limitations began to run at that time, even though [the plaintiff] was unable to establish the identity of the manufacturer of the DES ingested by her mother." (*Ibid.*) In *Norgart*, *supra*, 21 Cal.4th at page 390, the daughter of the plaintiffs committed suicide by intentionally taking an overdose of prescription drugs, including Halcion. The high court "upheld the superior court's grant of summary

21.

judgment against the plaintiffs, reversing the Court of Appeal, and finding that the plaintiffs had reason soon after their daughter's death to discover their causes of action for wrongful death against [defendant] Upjohn for manufacturing and distributing Halcion." (*Fox*, *supra*, 35 Cal.4th at p. 814.) The court "found that there was no triable issue of material fact and that Upjohn was entitled to judgment on the statute of limitations defense because the plaintiffs had reason to discover their cause of action against Upjohn soon after their daughter's death when they learned at that time of her depression and suicide by taking an overdose of prescription drugs, including Halcion." (*Ibid.*) "In both *Jolly* and *Norgart*, the court emphasized that the plaintiffs had ample reason to suspect the basis of their claims." (*Ibid.*)

In contrast, the allegations in *Fox* showed that "a diligent plaintiff's investigation may only disclose an action for one type of tort (e.g., medical malpractice) and facts supporting an entirely different type of tort action (e.g., products liability) may, through no fault of the plaintiff, only come to light at a later date." (*Fox*, *supra*, 35 Cal.4th at p. 814.) "Although both [medical malpractice and products liability] claims seek to redress the same physical injury to the plaintiff, they are based on two *distinct types of wrongdoing* and should be treated separately in that regard." (*Id.* at pp. 814–815, italics added.) Accordingly, not all claims arising from an injury necessarily accrue simultaneously; it is possible under the discovery rule that different claims arising from a single injury may accrue at different times if the claims are "based upon distinct types of wrongdoing" and the plaintiff acted diligently. (*Id.* at p. 815.)

### B.    Analysis

In the operative complaint, Primex alleged:

> "[Primex] did not discover that Defendants were selling irrigation water to pistachio growers for profit and that, in doing so, Defendants were violating various provisions in the Public Utilities Code, including, but not limited to, §§ 532, 2701, 2702, 2705, and 2712, until the deposition of Scott Hamilton, the person most knowledgeable at WMWC, was taken on February 18 and February 24, 2010 in [the Chaparral case]. [Primex] …

22.

was not able to discover facts concerning Defendants' profiteering and their violation of various provisions in the Public Utilities Code before such dates because Defendants' related entities … aggressively avoided submitting to depositions and written discovery on 'water issues' for over seven months and Defendants claim that such 'water information' constitutes carefully guarded trade secrets. Thus, despite [Primex's] diligent efforts, Defendants' unlawful behavior in profiteering on irrigation water banked by WMWC and Paramount Farming—in violation of the Public Utilities Code—could not have been discovered before the Scott Hamilton deposition finally took place on February 18 and 24, 2010."

In its order granting defendants' motion for directed verdict, the trial court rejected Primex's discovery rule argument, explaining:

"There is no substantial evidence supporting the view that Mr. Amin did not know, or at least suspect, before August 31, 2007, that water was the instrumentality that was used by Paramount to cause Chaparral to sever its relationship with [Primex].

"The theory advanced in [Primex's] third amended complaint and at trial which it claims supports a further delay in the accrual of its cause of action against defendants is that [Primex] could not have reasonably learned facts supporting its allegation that defendants' conduct violated the Public Utilities Code until February, 2010 .… However, whether or not [Primex] knew or suspected the specific statute allegedly violated by defendants in August, 2007, Mr. Amin admitted at trial that he believed offering water for pistachios was 'wrong' and that it was 'unfair competition.' Thus, [Primex] knew, or suspected, before the end of August, 2007, that defendants' conduct was 'wrongful by some legal measure other than the fact of interference itself.' (*Korea Supply*[, *supra*,] 29 Cal.4th [at pp. 1153–1154].) Put another way, the undisputed evidence shows that by the end of August, 2007, [Primex] knew, or at least suspected, that a 'type of wrongdoing [had] injured [it.]' (*Fox*, *supra*, 35 Cal.4th at [p.] 807.)

"The court can find no support for the argument that accrual should be delayed until [Primex] discovered or reasonably should have discovered that defendants['] alleged offer of water to Chaparral allegedly violated the Public Utilities Code. The cases that have been located on the subject require only knowledge or suspicion of the *factual*, not the *legal* basis for a claim. '[T]he plaintiff discovers the cause of action when he at least suspects a factual basis, as opposed to a legal theory, for its elements, even if he lacks knowledge thereof—when, simply put, he at least "suspects … that someone had done something wrong" to him …, "wrong" being used, not in any technical sense, but rather in accordance with its "lay

23.

understanding" [citations]. He has reason to discover the cause of action when he has reason at least to suspect a factual basis for its elements. (Citation.)' (*Norgart*, *supra*, [21 Cal.4th] at pp. 397–[398, fn. omitted].)"

We agree with the trial court's reasoning. "[W]e do not take a hypertechnical approach to the application of the discovery rule" but rather "look to whether the plaintiffs have reason to at least suspect that a type of wrongdoing has injured them." (*Fox*, *supra*, 35 Cal.4th at p. 807.) Here, Amin suspected in the spring of 2007 that Paramount was offering irrigation water to growers to try to sign them up for sales contracts, and he thought this behavior by Paramount was "wrong." In addition, Primex asserted a claim of "Interference With Economic Advantage" against Cal Pure in its original complaint in the Chaparral case filed on August 31, 2007. From this evidence, it is clear that Primex suspected a "type of wrongdoing" (*ibid.*) had injured it by August 31, 2007, and the type of wrongdoing Primex suspected was interference with prospective economic advantage. This case is not like *Fox*, where the plaintiff's diligent investigation revealed one type of tort (medical malpractice), but the plaintiff only discovered facts supporting "an entirely different type of tort" (products liability) at a later time. (*Id.* at p. 814.) Here, there was only one type of tort, interference with prospective economic advantage.

Primex argues that it could not have known a factual basis for its current claims, which are based on alleged violations of the Public Utilities Code, until it learned that defendant WMWC, a mutual water company, was the source of the water being offered by Paramount. Primex's theory is that defendant WMWC violated the Public Utilities Code by selling water to a nonmember for a price above cost. We are not convinced. Again, Amin thought that offering water for sale as an inducement to switch processors was "wrong" when he heard about it in the spring and summer of 2007. When this alleged wrongdoing resulted in harm to Primex through the loss of Chaparral's 2007 pistachio crop, the claims for interference with prospective economic advantage accrued. Accrual of the claims did not require Primex to identify all specific facts and legal

theories to support its suspicion of wrongdoing. "[T]he limitations period begins once the plaintiff ""'has notice or information of circumstances to put a reasonable person *on inquiry ....*""" [Citation.] A plaintiff need not be aware of the specific 'facts' necessary to establish the claim; that is a process contemplated by pretrial discovery. Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights. So long as a suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait for the facts to find her." (*Jolly*, *supra*, 44 Cal.3d at pp. 1110–1111.)

Ignorance of the identity of a defendant does not postpone accrual of a claim. (*Fox*, *supra*, 35 Cal.4th at p. 807.) The Paramount II defendants point out that Primex could have filed a timely suit against Doe defendants and later used the relation-back doctrine when it learned the actual identities of these defendants. (See *Jolly*, *supra*, 44 Cal.3d at p. 1118.) Furthermore, Primex's suspicion that Paramount was offering irrigation water for sale—regardless of the source of the water—put Primex on notice of potential issues related to public utilities. Any person or corporation that offers irrigation water for sale to a number of different growers in different locations is likely to be subject to regulation under the Public Utilities Code.[8]

We also reject Primex's argument that the discovery rule should apply because defendants and Chaparral representatives "actively obscured the truth from Primex by playing dumb … and by false answers to interrogatories propounded in the Chaparral lawsuit." These allegations do not change the fact that, by the end of August 2007, Amin

---

[8] Public utilities subject to regulation are broadly defined. "*Any person, firm, or corporation*, their lessees, trustees, receivers or trustees appointed by any court whatsoever, owning, *controlling*, operating, or managing *any water system* within this State, *who sells*, leases, rents, or delivers *water to any person, firm, corporation*, municipality, or any other political subdivision of the State, whether under contract or otherwise, *is a public utility*, and is subject to the provisions of Part 1 of Division 1 [Pub. Util. Code, § 201 et seq.] and to the jurisdiction, control, and regulation of the commission, except as otherwise provided in this chapter." (Pub. Util. Code, § 2701, italics added.)

believed that interference by Paramount (in offering water for sale) had caused Chaparral to breach its contract with Primex.  In sum, the discovery rule does not apply in this case to postpone the accrual of Primex's claims.

## V.      *Accrual of claim*

Finally, Primex contends its claims did not accrue until the summer of 2008, because that is when the unlawful water transfer to Chaparral occurred.  Primex's claims of interference with prospective advantage required it to show that defendants interfered with Primex's economic relationship with Chaparral in a way that was independently wrongful.  (See *Korea Supply*, *supra,* 29 Cal.4th at p. 1154.)  Primex argues:  "Given the independent wrongful act element for a claim for interference with the prospective economic advantage, 'the time when the cause of action is complete' [quoting *Norgart*, *supra*, 21 Cal.4th at p. 397] did not occur until the summer of 2008, when Chaparral took delivery of water that was sold by WMWC at a profit in violation of the Public Utilities Code.  Stated in other terms, the wrongfulness of Defendants' conduct was not unlawful until the summer of 2008 when water was sold by a mutual benefit water company (and its agents) to Chaparral for a profit."

This argument is unavailing.  As we observed above in our discussion of the conspiracy allegations, according to Primex's own allegations, it was the *offer* to sell irrigation water to Chaparral by the Paramount II defendants in exchange for a sales contract that interfered with Primex's prospective economic advantage and caused Chaparral to sever its business relationship with Primex.  The actual delivery of water in 2008 could not have been the proximate cause of Chaparral breaching its contract in 2007.

"The tort of intentional interference with prospective economic advantage is not intended to punish individuals or commercial entities for their choice of commercial relationships or their pursuit of commercial objectives, *unless their interference amounts to independently actionable conduct.*"  (*Korea Supply*, *supra*, 29 Cal.4th at pp. 1158–1159,

26.

italics added.) "[I]nterference with prospective economic advantage is not tortious in and of itself"; it is the additional requirement that the interference is independently wrongful that "distinguishes lawful competitive behavior from tortious interference." (*Id.* at p. 1159.) Thus, to prove its claims, Primex was required to prove that defendants' interfering conduct of offering to sell irrigation water to Chaparral in exchange for a sales contract was wrongful apart from the interference itself.[9] It would not be enough for Primex to show that defendants engaged in interfering conduct that resulted in economic harm to Primex and *later* engaged in unlawful conduct. (See *LiMandri v. Judkins* (1997) 52 Cal.App.4th 326, 342 [alleged misappropriation of name did not qualify as "'independently wrongful'" conduct "because while it may have been independently tortious, it was not the act that constituted the interference with [the plaintiff's] prospective advantage"].) Primex had to prove the interfering conduct itself was unlawful. Since the delivery of water to Chaparral in 2008 was not the interfering conduct, the lawfulness of that delivery was not relevant to proving Primex's claims for interference with prospective economic advantage. It follows that the water delivery was not relevant the accrual of the claims either.

Having rejected all of Primex's arguments for postponing the accrual of its claims for interference with prospective economic advantage, we affirm the trial court's order granting defendants' motion for directed verdict on the ground the claims were barred by the statute of limitations. We need not address defendants' alternative grounds for affirming the judgment.

---

[9] "[A]n act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." (*Korea Supply*, *supra*, 29 Cal.4th at p. 1159, fn. omitted.)

## *DISPOSITION*

Primex's motion to augment the record is granted.  The judgment is affirmed.

Defendants are awarded costs on appeal.

_____
Kane, J.

WE CONCUR

_____
Cornell, Acting P.J.


_____
Gomes, J.